UNITED STATES, Appellee

v.

Bobby D. MORRISSETTE, Private
U.S. Army, Appellant

No. 11-0282

Crim. App. No. 20090166

United States Court of Appeals for the Armed Forces

Argued October 12, 2011

Decided January 24, 2012

BAKER, C.J., delivered the opinion of the Court, in which
ERDMANN, STUCKY, and RYAN, JJ., and EFFRON, S.J., joined.

<u>Counsel</u>

For Appellant:  Captain Barbara A. Snow-Martone (argued);
Lieutenant Colonel Imogene M. Jamison (on brief); Lieutenant
Colonel Jonathan F. Potter.

For Appellee:  Captain Kenneth W. Borgnino (argued); Major Sara
M. Root and Major Amber J. Williams (on brief); Major Katherine
S. Gowel.

Military Judge:  Timothy Grammel

<u>**THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION**</u>.

United States v. Morrissette, No. 11-0282/AR

Chief Judge BAKER delivered the opinion of the Court.

A military judge, sitting as a general court-martial, convicted Appellant, contrary to his pleas, of disobeying a commissioned officer, participating in a gang initiation (two specifications), wrongful use of a controlled substance, obstructing justice (two specifications), and indecent acts in violation of Articles 90, 112a, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 890, 912a, 934 (2006), respectively. The approved sentence provides for a bad-conduct discharge and forty-two months of confinement. The United States Army Court of Criminal Appeals set aside the charge of wrongful use of a controlled substance and reduced Appellant's sentence by one month but affirmed the remaining findings of guilty. United States v. Morrissette, No. ARMY 20090166, 2010 CCA LEXIS 453 at *19-*20, 2010 WL 5677920, at *7 (A. Ct. Crim. App. Dec 22, 2010).

This Court granted review of the following issues:

WHETHER APPELLANT'S FIFTH AMENDMENT RIGHT AGAINST SELF-INCRIMINATION WAS VIOLATED WHEN HE WAS PROSECUTED FOR OFFENSES ABOUT WHICH HE HAD PROVIDED IMMUNIZED STATEMENTS.

WHETHER AN ARTICLE 134 CLAUSE 1 OR 2 SPECIFICATION THAT FAILS TO EXPRESSLY ALLEGE EITHER POTENTIAL TERMINAL ELEMENT STATES AN OFFENSE UNDER THE SUPREME COURT'S HOLDINGS IN UNITED STATES v. RESENDIZ-PONCE AND RUSSELL v. UNITED STATES, AND THIS COURT'S RECENT OPINIONS IN MEDINA, MILLER, AND JONES.

2

SUMMARY

This case arose from the death of a soldier after a violent gang initiation ritual in Kaiserslautern, Germany, in July 2005. The Government became aware that a number of soldiers were present at the initiation, but Criminal Investigation Division (CID) agents were not able to confirm the identity of the soldiers, nor obtain inculpatory statements. Eventually, the Commanding General of the 21st Theater Support Command (21st TSC) granted testimonial immunity to Appellant and Private (PVT) Florentino Charris to obtain their testimony. At his first trial Appellant alleged that the Government was using his immunized testimony. Following a Kastigar[1] hearing, the military judge denied Appellant's motion to dismiss the charges finding that there was no impermissible use of his immunized testimony. However, the military judge disqualified the 21st TSC from prosecuting the case out of "an abundance of caution." Shortly thereafter, the Commanding General of the 21st TSC withdrew and dismissed all the charges against Appellant.

Appellant's case was subsequently transferred to a new command, prosecution, and investigative team; however, not all of the cautions set forth in Kastigar were followed. For example, the Government did not erect a formal "wall" between the pre-immunity and post-immunity investigative materials. In

---

[1] Kastigar v. United States, 406 U.S. 441 (1972).

addition, although the second prosecution team received a redacted record from the first trial, Appellant argues that it nonetheless contained information derived from immunized testimony.

Moreover, the second trial counsel contacted the redacting officer regarding how certain charges might be drafted in Appellant's case.  At his subsequent trial, Appellant asserted that the Government had used, and was using, his immunized testimony directly and indirectly to facilitate his prosecution. Following another Kastigar hearing the second military judge determined that "the prosecution met its heavy burden to show that there was no direct or indirect use of the immunized statements."

We now affirm.  Appellant has not demonstrated that the military judge's findings of fact are clearly erroneous or that he misapprehended or misapplied the law.  To the contrary, the military judge's ruling is comprehensive and well reasoned.

The law in this area is settled and sound.  Applying the England[2] factors, we conclude that the military judge did not abuse his discretion in determining that the Government has demonstrated that it did not make direct use of Appellant's testimony.  While some of the England factors cut in favor of Appellant, the ultimate question presented in this case is not

_____

[2] United States v. England, 33 M.J. 37, 38-39 (C.M.A. 1991).

4

whether the Government followed best practices (it did not) or whether the decision to prosecute occurred prior to the immunized testimony (it did not), but whether the Government made direct use of the content of Appellant's immunized statements.  The Government has met its burden in this regard.  Further, although presenting a closer question, the military judge did not abuse his discretion in determining that the Government demonstrated that it did not make indirect use of Appellant's immunized testimony.

FACTS

Appellant was a member of the Gangster Disciples.  To others on base, Appellant and Sergeant (SGT) Juwan Johnson seemed to be best friends.

On the night of July 3, 2005, SGT Johnson and about ten other people drove to a remote location to initiate SGT Johnson into the Gangster Disciples.  The Gangster Disciples, also known as the Brothers of the Struggle, BOS, or Growth and Development, is a gang that was originally formed in Chicago.  The gang uses propaganda about its organization to draw young people into the group.  The symbol associated with the gang is a six-point star.  To be a part of the gang, a nonmember must gain basic knowledge of the gang, associate with other members, and be asked by the group to be initiated.  Generally, sects of the Gangster Disciples initiate members differently, but new members are

commonly "jumped-in." In a jump-in, members beat the initiate continuously and simultaneously for a certain amount of time.[3]

In this case, nine men lined up and circled around SGT Johnson and repeatedly and simultaneously punched and kicked him for roughly six minutes. During the six-minute period, Appellant personally punched SGT Johnson no less than twenty times. Following the beating, SGT Johnson was carried to a vehicle and driven to his barracks, where he died hours later on the morning of July 4, 2005. PVT Charris found and reported the body.[4] The Charge of Quarters (CQ) called an ambulance; however, it was too late. An autopsy concluded that blunt force trauma resulting in brain hemorrhaging and cardiac contusion ultimately caused SGT Johnson's death.

A. The Pre-Immunity Investigation

As a result of SGT Johnson's death, CID initiated an investigation on July 4, 2005. On the same day, CID interviewed PVT Charris about SGT Johnson's death. PVT Charris made two separate sworn statements. In the first statement, PVT Charris

---

[3] An expert on gangs testified at trial that he had encountered Gangster Disciple jump-ins with many variations. For example, he stated that typically the jump-in includes three to six members, however he has seen them with only one gang member. In addition, a jump-in may generally last for thirty seconds or sixty seconds.

[4] PVT Charris was a specialist (E-4) when he made the July and August 2005 statements. However, by January 2006 he had been reduced to private (E-1).

denied having any specific knowledge of SGT Johnson's death.
PVT Charris did not implicate Appellant or anyone else in SGT
Johnson's death.

PVT Charris was interviewed again later that day after a
source told CID that SGT Johnson's death was the result of a
gang initiation ritual. Thereafter, at approximately 10:45
p.m., Special Agent (SA) William Hughes informed PVT Charris
that he was suspected of involuntary manslaughter and making a
false official statement. After waiving his rights, PVT Charris
made a second sworn statement that SGT Johnson had been in a
fight downtown. PVT Charris denied any involvement in the
Gangster Disciples, but admitted that he had heard of them.
When asked whether he was a member of the Gangster Disciples or
any other gang, PVT Charris stated that he knew Appellant but
did not know whether Appellant was a member of the gang.

The next day, SA Hughes told Appellant that he was
suspected of involuntary manslaughter. Appellant waived his
rights and denied any knowledge of the Gangster Disciples or
what happened to SGT Johnson on the night of July 3, 2005.

On August 10, 2005, SA Jason Waters informed Appellant that
he was suspected of manslaughter, aggravated assault, making a
false official statement, and conspiracy. Appellant was then
informed of his rights, which he waived. Appellant subsequently
gave another sworn statement to CID, stating that he had made

plans to go to the club with SGT Johnson on July 3, 2005. Appellant changed his original story, saying that SGT Johnson called him around midnight on the night of July 3, 2005, saying that he was hurt. Appellant traveled to SGT Johnson's barracks, found him in the passenger seat of SGT Johnson's car with the seat reclined all the way back. With the help of PVT Charris and other individuals in the area, Appellant carried SGT Johnson to his room. Appellant also stated that SGT Johnson had defecated on himself and that he urged SGT Johnson to go to a doctor, but that SGT Johnson said that he was okay. Appellant said that he got SGT Johnson a bottle of water and told SGT Johnson to call him if he needed anything.

SA Charles Sanchez talked to PVT Charris on August 10, 2005, again. PVT Charris provided new incriminating information about Appellant and several other people. PVT Charris admitted that he was aware of SGT Johnson's jumping-in on July 3, 2005. PVT Charris also stated that Appellant was a Gangster Disciple and that he was likely present at Johnson's jumping-in. Despite being a Gangster Disciple for three months, PVT Charris stated that he was not at SGT Johnson's jumping-in. Again, PVT Charris discussed how SGT Johnson was moved to his barracks room and talked about his physical condition, including that SGT Johnson was wearing "shorts, no shirt and Timberland boots." On August 19, 2005, Private First Class (PFC) Latisha "Nikki" Ellis

confirmed to CID that PVT Charris was a member of the Gangster Disciples. PFC Ellis was not a member of the Gangster Disciples, but was friends with many of the members and had started to attend the gang's meetings in June 2005. PFC Ellis witnessed SGT Johnson's jumping-in. Additionally, SA Sanchez interviewed Specialist (SPC) Towanna Thomas on November 28, 2005. SPC Thomas said that she had seen SGT Johnson on the evening of July 3, 2005, at an ATM and he was not wearing the type of clothes someone would wear to the club.

This portion of the investigation was neither catalogued nor walled off from the post-immunity investigation and all investigators and the first prosecution team had access to all aspects of the investigation. This included all of the post-immunity statements made by Appellant and PVT Charris.

B. The Post-Immunity Investigation

On December 13, 2005, PVT Charris was granted testimonial immunity.[5] On December 16, 2005, Appellant was granted testimonial immunity. Specifically, the commander's immunity

---

[5] A grant of testimonial immunity provides "immunity from the use of testimony, statements, and any information directly or indirectly derived from such testimony or statements by that person in a later court-martial." Rules for Courts-Martial (R.C.M.) 704(a)(2). It is "the minimum grant of immunity adequate to overcome the privilege" against self-incrimination provided by the Fifth Amendment to the Constitution and Article 31, UCMJ, 10 U.S.C. § 831 (2006). "[N]either the testimony of the witness nor any evidence obtained from that testimony may be used against the witness at any subsequent trial . . . ." Military Rule of Evidence 301(c)(1).

order to Appellant stated:

> I order you to fully cooperate with and provide
> truthful and complete information to law
> enforcement officers and attorneys during the
> investigation and to testify at any Article 32,
> Uniform Code of Military Justice (UCMJ) hearing
> and court-martial, if any, pertaining to the
> death of SGT Juwan L. Johnson.  Any information
> given by you pursuant to this order, or any
> information directly or indirectly derived from
> such testimony or other information, shall not be
> used against you in a trial by court-martial or
> proceedings under Article 15, UCMJ, except
> prosecution for perjury, false swearing, giving a
> false statement, or otherwise failing to comply
> with this order.

On December 21, 2005, Appellant provided an immunized, sworn statement to SA Sanchez.  Appellant said that everything in his last statement was true and he again denied having any knowledge of how SGT Johnson died.  Again, Appellant stated that he helped SGT Johnson out of his car on the night of July 3, 2005, and that SGT Johnson was wearing Timberlands and a t-shirt. Appellant thought that SGT Johnson may have been drunk and had some beers without him that night.

In early January 2006, the defense counsel for PVT Charris informed PVT Charris that another suspect had also been given immunity.  Defense counsel did not know what, if any, information Appellant had provided, but defense counsel advised PVT Charris to cooperate fully and truthfully.[6]  Over the next

---

[6] Appellant does not argue on appeal that PVT Charris's statements made after Appellant's grant of immunity were

10

few months, PVT Charris provided four sworn statements to CID.
In one statement, PVT Charris stated that Appellant was present
at SGT Johnson's jumping-in.

During 2006, Appellant made three more statements to CID.
On March 31, 2006, Appellant provided an oral statement to SA
Kim Jones, denying any knowledge of SGT Johnson's death.  On
October 18, 2006, the 21st TSC preferred charges against
Appellant, including involuntary manslaughter.  The preferral
packet included Appellant's immunized statements and a
prosecution memo written by lead trial counsel Captain (CPT)
Jocelyn Stewart stating that "despite the grant of immunity, SPC
Morrissette refused to cooperate."

On October 20, 2006, during an investigation into unrelated
allegations that Appellant engaged in sexual relations with a
14-year-old German girl in front of two other soldiers, SA Louis
Garcia asked Appellant to make a written statement.  SA Garcia
reported that Appellant then responded that he was "getting to
his breaking point, due to other law enforcement investigations
he [was] involved in, and [was] ready to hurt somebody at the
slightest provocation."  Appellant also commented on the types
of cars that SA Garcia drove, said that he had seen SA Garcia's

---

derivative evidence of immunity given to Appellant.  The
military judge at Appellant's court-martial concluded that
"[k]nowledge by a co-accused of a grant of immunity by itself
with no impermissible use of the immunized statements does not
trigger the Kastigar protections."

11

wife and knew where she parked and where they met for lunch, and that he had dreams about SA Garcia. SA Garcia, a second lieutenant, was assigned to be the lead investigator of SGT Johnson's death for the 5th MP Battalion, CID, in March 2006.

Finally, on December 4, 2006, SA Dennis Whitfield attempted to interview Appellant about SGT Johnson's death. While waiting for defense counsel to arrive, Appellant spontaneously stated "that he had nothing to do with SGT Johnson's death; that CID was trying to prosecute him for something he did not do; that before he'd go to jail he would kill himself; and that he would either walk out of court a free man or inside of a body bag."

The investigation into Appellant's involvement in SGT Johnson's death was not completed until February 2007, when the Government interviewed PFC Ellis. On February 12, 2007, PFC Ellis provided a sworn statement to CID that she was at the jump-in and that Appellant was present and held SGT Johnson up while others beat him.

On February 14, 2007, the 21st TSC referred charges against Appellant and on March 22, 2007, withdrew Appellant's grant of immunity. The defense filed a motion to dismiss all charges on the basis that the charges violated the terms of the immunity agreement. As required by Kastigar, the military judge held a hearing to determine whether the Government had used any immunized testimony. The military judge denied the motion to

dismiss the charges, because he found that the Government had made no impermissible use of Appellant's immunized testimony. However, the military judge disqualified the convening authority and the Office of the Staff Judge Advocate of the 21st TSC, which included CPT Stewart. The military judge did so out of "an abundance of caution." On June 14, 2007, before any evidence was presented on the merits, the commander of the 21st TSC dismissed the charges, without prejudice. During this time, Appellant's unit was redesignated and transferred to the command and jurisdiction of the 7th Army Joint Multinational Training Command (7th JMTC).

C. Redaction of Immunized Materials and Current Prosecution

In the fall of 2007, the 21st TSC forwarded the fourteen-volume record of trial to the Office of the Judge Advocate, United States Army Europe. Colonel (COL) Michael Mulligan, the Deputy Judge Advocate for United States Army Europe, reviewed the entire record in order to redact Appellant's immunized statements, statements made by PVT Charris after Appellant was immunized, the transcript of the Kastigar hearing, and certain other evidence. This took COL Mulligan several months and he completed the process in the spring of 2008. The redacted record provided to the new prosecution team contained the following items now at issue in Appellant's case: (1) CPT Stewart's prosecution memo; (2) the 21st TSC's witness list;

13

(3) the 21st TSC charge sheet; (4) the Article 32, UCMJ, 10 U.S.C. § 832 (2006), investigation report, as redacted; and (5) CID agent summaries of Appellant's statements in October and December 2006.

At some point in late 2007, CPT Derrick Grace was detailed as trial counsel for the 7th JMTC. CPT Grace reviewed the redacted record, which included the documents listed above. CPT Grace talked to CID but the conversation was limited and CPT Grace did not review the investigative file. CPT Grace's interaction with the 21st TSC was also limited; however, Grace did attend a trial of one of the coactors in the jumping-in. Neither Appellant nor PVT Charris testified at the trial and none of their statements were mentioned. The military judge noted that CPT Grace "unwisely observed the trial" but that CPT Grace ultimately was not exposed to immunized statements or derivative evidence.

In May 2008, CPT Grace corresponded by e-mail with COL Mulligan, for whom he had previously worked, and informed COL Mulligan that they would prefer charges against Appellant within the next week. CPT Grace also told COL Mulligan that their investigators had evidence of Appellant's involvement in at least two other jump-ins and that he was trying to decide how to charge the conduct. COL Mulligan advised CPT Grace that he had charged similar behavior under Article 134, UCMJ, and told CPT

Grace to "look at [United States] v. Billings and a general 134 offense." After CPT Grace thanked COL Mulligan for the suggestion, COL Mulligan responded that he was not certain that the Article 134, UCMJ, "Billing[s] offense [was] the answer, [because he] charged that as being a member of a criminal street gang" and CPT Grace did not have those particular facts.

On June 24, 2008, charges were preferred against Appellant. The military judge noted that "many [of the] charges cover the same alleged misconduct covered by charges in the prior prosecution, the charging strategy is significantly different." In response to Appellant's motion, the military judge concluded that "[t]he immunized statements played no role in the decision to prosecute" and that the Government did not directly or indirectly use Appellant's immunized statements. The instant charges were referred on October 7, 2008. Appellant was arraigned on October 27, 2008, and a second Kastigar hearing was held on November 24 and 25, 2008.

The military judge acquitted Appellant of the most serious charges relating to SGT Johnson's death, but convicted Appellant of violating the no-contact order, wrongful use of ecstasy, an indecent act, participating in a gang initiation (two specifications), and obstruction of justice (two specifications).

On appeal, Appellant argues that the conviction violates his Fifth Amendment privilege against self-incrimination. Specifically, Appellant argues that this prosecution was tainted because investigators and prosecutors were exposed to his immunized statements and improperly used his testimony indirectly in order to prosecute him. In affirming Appellant's convictions, the Court of Criminal Appeals dismissed Appellant's immunity claim without discussion of the Kastigar issues raised. Morrissette, 2010 CCA LEXIS 453, at *2, 2010 WL 5677920, at *1.

DISCUSSION

A.  Kastigar Immunity

The Fifth Amendment's privilege against self-incrimination provides that "'[n]o person . . . shall be compelled in any criminal case to be a witness against himself.'" United States v. Mapes, 59 M.J. 60, 65 (C.A.A.F. 2003) (alteration in original). However, the privilege against self-incrimination is neither "absolute nor inviolate." Id. at 66. In Kastigar, 406 U.S. 441, 444-46 (1972), the United States Supreme Court held that the government may compel a witness to testify under a grant of use or derivative-use immunity contrary to the witness Fifth Amendment privilege against self incrimination. "[I]mmunity from the use of the compelled testimony and evidence derived therefrom is coextensive with the scope of the

16

privilege" and "is sufficient to compel testimony over a claim of the privilege." Id. at 452-53. See also R.C.M. 704 (a)(2).

Because the purpose of the Fifth Amendment privilege is to "afford protection against being 'forced to give testimony leading to the infliction of penalties affixed to . . . criminal acts,'" testimonial immunity only applies to compelled testimony and not all statements made by an accused. Kastigar, 406 U.S. at 443 (quoting Ullman v. United States, 350 U.S. 422, 438-39, 453 (1956) (quotation marks omitted). Further, for a communication to be considered testimonial, it must "explicitly or implicitly, relate a factual assertion or disclose information." Doe v. United States, 487 U.S. 201, 210 (1988).

Both the Supreme Court and this Court in the military context have interpreted "use" to include evidentiary and nonevidentiary uses, including the indirect use of testimony to alter the investigative strategy or to inform the decision to prosecute. See Mapes, 59 M.J. at 67; see also United States v. Hubbell, 530 U.S. 27, 39 (2000) (noting that in Kastigar, the Supreme Court "emphasized the critical importance of protection against a future prosecution based on knowledge and sources of information obtained from the compelled testimony" (quoting Kastigar, 406 U.S. at 454) (quotation marks omitted)); United States v. Olivero, 39 M.J. 246, 249 (C.M.A. 1994) (citing United States v. Kimble, 33 M.J. 284 (C.M.A. 1991)).

17

However, in contrast to transactional immunity, testimonial immunity does not impose a per se bar to prosecution of the witness for the offenses about which the testimony or information is given under grant of immunity.  See R.C.M. 704. The government may prosecute an immunized witness where it can demonstrate that it has made neither direct nor indirect use of the testimony.  Because an accused has been compelled to relinquish his right against self-incrimination, the government bears the burden to prove that its evidence is not tainted by immunized testimony.  Kastigar, 406 U.S. at 461-62; United States v. Youngman, 48 M.J. 123, 127 (C.A.A.F. 1998).  The government must affirmatively prove by a preponderance of the evidence that its evidence "is derived from a legitimate source wholly independent of the compelled testimony."  Kastigar, 406 U.S. at 460; Olivero, 39 M.J. at 249; see also United States v. Boyd, 27 M.J. 82, 85 (concluding that an appellant is "'not dependent for the preservation of his rights upon the integrity and good faith of the prosecuting authorities'" (quoting Kastigar, 406 U.S. at 460)).

A grant of immunity must leave the witness and the government in "'substantially the same position as if the witness had claimed his privilege in the absence of a state grant of immunity.'"  Kastigar, 406 U.S. at 457 (quoting Murphy v. Waterfront Comm'n, 378 U.S. 52, 79 (1964)); Olivero, 39 M.J.

at 249-50.  While there is no per se rule requiring a prosecutor who has been exposed to immunized statements to withdraw from the case, see United States v. McGeeney, 44 M.J. 418, 422-23 (C.A.A.F. 1996) (failing to adopt rule that exposure to immunized testimony is prima facie use), separating pre-immunity from post-immunity evidence is considered a best practice. England, 33 M.J. at 39.  Further, while this Court has not required that a wall be set up to separate the pre-immunity and post-immunity investigative and prosecution teams; it is also considered a best practice, because a well constructed wall is demonstrative evidence that the prosecution did not make direct or indirect use of immunized testimony.  If prosecutors are exposed to immunized testimony, the burden remains the same -- the government must demonstrate that the immunized testimony was not used or derivatively used against an accused and was obtained from wholly independent and legitimate sources.

In this case, the best practices were not followed, leaving the military judge to determine whether the Government has met its burden to prove that the decision to prosecute Appellant as well as the evidence used against him were developed independent of Appellant's immunized statements.  Whether the Government has shown, by a preponderance of the evidence, that it has based the Appellant's prosecution on sources independent of the immunized statements is a preliminary question of fact.  Mapes, 59 M.J. at

19

67. "This Court will not overturn a military judge's resolution of that question unless it is clearly erroneous or is unsupported by the evidence." Id. (citing Samples v. Vest, 38 M.J. 482, 487 (C.M.A. 1994)).

B.  The Statements at Issue

A necessary first step is to identify those statements that were compelled from Appellant and thus subject to Kastigar review.  This determination is complicated in this case because Appellant made six statements, four of which occurred after he was immunized, and one of which was in the context of a different investigation.

Appellant argues that all four of his statements made to CID after he received immunity were covered by the grant of immunity.  The military judge disagreed.  On the one hand, the military judge concluded that Appellant's "compelled testimony" reached beyond his actual testimony to include "all information provided to law enforcement officers and attorneys during the investigation pertaining to the death of SGT Juwan L. Johnson." On the other hand, the military judge concluded that only Appellant's statements on December 21, 2005, and March 31, 2006, were addressed to the investigation of SGT Johnson's death, and thus covered by the grant of immunity, whereas the other statements were not covered by the grant of immunity.

We agree with the military judge's conclusion and conclude that he did not abuse his discretion by making this determination. First, on October 20, 2006, Appellant made a voluntary statement during an interview unrelated to the investigation into SGT Johnson's death. This was not compelled testimony and it was not covered by the grant of testimonial immunity. Second, on December 4, 2006, Appellant made another statement that was outside of the grant of immunity. On this date, SA Whitfield was going to attempt to interview Appellant about SGT Johnson's death. After Appellant invoked his Article 31, UCMJ, right to counsel, he waited for counsel to arrive. In the meantime, SA Whitfield decided not to interview Appellant. Without being asked a question, Appellant made spontaneous statements to investigators.

These statements were not compelled, since Appellant voluntarily provided this information. See Doe, 487 U.S. at 210. Therefore, the military judge correctly concluded that the information compelled from Appellant, pursuant to the grant of immunity and order to cooperate with investigators and to testify, consisted of Appellant's statements on December 21, 2005, and March 31, 2006.

C. Direct Use of Immunized Testimony

Having first determined which of Appellant's statements are at issue, we must now determine whether the military judge erred

21

in determining that the Government demonstrated that it did not make direct or indirect use of Appellant's statements. The England factors guide our analysis. These factors include:

1. Did the accused's immunized statement reveal anything "which was not already known to the Government by virtue of [the accused's] own pretrial statement"?

2. Was the investigation against the accused completed prior to the immunized statement?

3. Had "the decision to prosecute" [the] accused been made prior to the immunized statement? and,

4. Did the trial counsel who had been exposed to the immunized testimony participate in the prosecution?

33 M.J. at 38-39.

However, the England factors are not necessarily determinative as to whether the Government has or has not met its burden. That is because the ultimate question is whether the Government has made any direct or derivative use of immunized evidence, not whether it adhered to a particular timeline or process. Applying the foregoing principles and these factors, we conclude that the Government carried its burden.

The first England factor is whether the appellant's immunized statement revealed new information not previously known to the Government. Id. at 38. Here, the Government argues that Appellant's immunized statements did not reveal any information not previously known to the Government. Appellant

argues that while his statements did not provide significant detail, they did provide details divergent from the statements of others and thus indicated to the Government that Appellant was not fully cooperating.  On this factor, the Government has the better argument.  The December 21, 2005, statement provided no new information regarding the death of SGT Johnson.  First, Appellant stated that he was truthful in his pre-immunity statement and that he did not know any more details of SGT Johnson's death.  Second, while the statement included the detail that SGT Johnson had been wearing Timberland boots and not wearing "clubbing clothes," the Government already knew this information from the testimony of other witnesses.

The Government knew that SGT Johnson had been wearing Timberlands because PVT Charris had mentioned this in his August 10, 2005, sworn statement, and it knew that SGT Johnson's clothes were not "clubbing clothes" from a prior interview with SPC Thomas.  On March 21, 2006, Appellant provided no additional information in his second immunized statement.  Appellant simply denied any additional knowledge of SGT Johnson's death and membership in the Gangster Disciples.

In England, this Court held that information is not revealed in an immunized interview when "nothing [is] learned in the interview which might incriminate appellant or otherwise be

used to his disadvantage." 33 M.J. 37, 39.[7] As a result, this Court concluded that the government's interview with the appellant was a "non-event" because he provided no information and because nothing happened as a consequence of the interview. Id. at 39. This case is similar.

In this case, the military judge concluded that the statements "did not produce any leads, alter the investigation strategy, or influence any aspect of the investigation." Based on the foregoing analysis the military judge did not err.

The second England factor is whether the 7th JMTC completed its investigation before granting testimonial immunity to Appellant. The military judge found that a significant portion of the investigation occurred after the Government had granted immunity to Appellant. The facts clearly support this finding, which cuts in Appellant's favor. The grant of immunity occurred on December 16, 2005, and the investigation of Appellant's conduct was not concluded for at least another year, as evidenced by his four statements after this date.

---

[7] In that case, the appellant was investigated for cocaine use in conjunction with the drug-overdose death of his roommate. 33 M.J. at 38. The appellant was interviewed and admitted to using cocaine. Id. Later, pursuant to a grant of immunity, the appellant was asked whether he could provide any information about the roommate's drug use but the appellant denied any knowledge. Id. The appellant was later charged with cocaine use. Id. The appellant was unsuccessful in his attempt to dismiss the case for taint because the military judge found that nothing was learned from the interview. Id. at 39.

The third England factor asks whether "the decision to prosecute" Appellant was made prior to the immunized statement. The military judge found that the decision to prosecute was not made prior to the first immunized statement. The facts clearly support this finding. The Government decided to prosecute Appellant after granting him immunity. However, the second prosecution team only had access to the redacted case file before filing the current charges and never had access to the full CID file, which contained Appellant's immunized statements. Nonetheless, this factor favors Appellant.

Finally, the fourth England factor is whether the trial counsel who were exposed to immunized testimony participated in the prosecution. No trial counsel who was exposed to the immunized testimony participated in the prosecution. However, members of the second prosecution team were exposed to some materials from the original prosecution. Specifically, CPT Grace had access to the 21st TSC's witness list, the redacted original Article 32, UCMJ, investigation report, the prosecution memorandum, and the 21st TSC charge sheet. However, critically, the materials did not contain the content of Appellant's immunized statements with the exception of the earlier discussed references to Timberland boots and clubbing clothes.[8]  Therefore,

---

[8] First, the witness list includes the names of all potential thirty-seven Government witnesses, only two of whom were exposed

the second prosecution did not and could not have directly used Appellant's immunized testimony.

Appellant's direct-use argument therefore hinges on the second prosecution team's access to the original prosecution memo. This memo states that "despite the grant of immunity, [Appellant] refused to cooperate." The situation is similar to one presented in United States v. Montoya, 45 F.3d 1286 (9th Cir. 1995). In that case, a second prosecution team was also exposed to statements regarding the appellant's prior lack of cooperation with the investigation. Id. at 1290, 1295. Ultimately, the United States Court of Appeals for the Ninth Circuit found that descriptions of how the appellant was not being truthful did not involve improper use of immunized testimony because the second prosecution team did not actually have access to the immunized statements. Id. at 1297. We agree with the Ninth Circuit's approach. Without access to the content of the statements themselves, Appellant's immunized

_____

to Appellant's testimony. But, the document does not contain descriptions of potential testimony. It simply lists the name of each witness and a brief description of his or her involvement with the investigation. Second, the charge sheet lists all original charges against Appellant, but did not include any immunized testimony. Third, the prosecution memorandum is a three-page document that includes the charges, key evidence to be introduced at trial, and sentencing considerations. Fourth, the Article 32, UCMJ, investigation report is an ten-page document that includes all of the original charges with details about each specification. Portions involving PVT Charris are redacted.

testimony, could not have directly tainted his trial.  Moreover, the grant of immunity appears to have contemplated this exact scenario, stating that testimonial immunity does not bar later prosecutions for failure to comply with the grant.  R.C.M. § 704(b)(2).  Because the documents that the second prosecution team was exposed to did not contain the actual statements that Appellant made, the only potential effect on the current prosecution would be indirect and thus the military judge did not abuse his discretion in concluding that the Government met its burden on the direct use of Appellant's immunized testimony.

D.  Indirect Use of Testimony

Additionally, the prosecution was not indirectly tainted by Appellant's immunized testimony.  Appellant argues that the prosecution was indirectly tainted in two ways.  First, Appellant alleges that the deputy judge advocate in charge of redacting the immunized materials gave "case-specific" advice via e-mail to the current trial counsel on how to charge Appellant.  This Court concluded in a similar case that a new prosecutor was insulated from the original prosecution team when the two attorneys did not have discussions about the evidence or the facts of the case.  McGeeney, 44 M.J. at 423.  Here, the current prosecutor, CPT Grace, had a discussion via e-mail with COL Mulligan but they never discussed evidence or the facts in the case.

The military judge pointed this out as a potential conduit for taint because the relationship between COL Mulligan and CPT Grace created a "pipeline from a person who was probably overexposed to the immunized statements to the trial counsel." However, the military judge's finding that Appellant's immunized statements had no impact or influence on what COL Mulligan communicated to CPT Grace is not clearly erroneous. The military judge's finding is supported by the plain text of the e-mail exchange. Because Appellant did not reveal any new information in his immunized statements, the communication between COL Mulligan and CPT Grace would have been the same had Appellant invoked his Fifth Amendment right against self-incrimination. While COL Mulligan and CPT Grace should not have been discussing the case via e-mail because of the potential for taint, the fact remains that Appellant did not reveal any new information about the case in his immunized testimony.

Additionally, Appellant argues that the current prosecution team was indirectly motivated in its decision to prosecute him because the team had access to particular documents that indicated he had not cooperated with the first investigation. However, the evidence suggests that the current prosecution team had an independent basis for knowing that Appellant did not cooperate with the investigation. Appellant's pre-immunity statement implied that he was not cooperating. Even though he

claimed that he did not know how SGT Johnson had died and denied all knowledge of the Gangster Disciples, other witnesses placed Appellant at the scene of the crime and as a member of the gang, including PFC Ellis and SSG Themitrios Saroglou.  Moreover, the terms of the testimonial immunity rule and Appellant's immunity agreement itself make clear that the Government may later prosecute a witness for his failure to duly cooperate with the order to testify.  R.C.M. 704(b)(1).  Therefore, we agree with the military judge's finding that the prosecution was not indirectly tainted by Appellant's immunized testimony.  Thus, we hold that the military judge did not abuse his discretion in applying the law and that his findings of fact were not clearly erroneous.

## CONCLUSION

We conclude that the military judge did not abuse his discretion in deciding that the Government met its burden under Kastigar.  The decision of the United States Army Court of Criminal Appeals is affirmed except with regard to the findings of guilty to Charge III, Specifications 4, 5, and 6, and the sentence.  The decision of the lower court is vacated as to those specifications and the record is returned to the Judge Advocate General of the Army for remand to the United States Army Court of Criminal Appeals for further consideration of those offenses in light of United States v. Fosler, 70 M.J. 225

29

(C.A.A.F. 2011), and for reassessment of the sentence, or if it determines appropriate, for the ordering of a rehearing on sentence.