UNITED STATES, Appellee

v.

Evan VELA, Sergeant
U.S. Army, Appellant

No. 12-0194

Crim. App. No. 20080133

United States Court of Appeals for the Armed Forces

Argued May 15, 2012

Decided July 18, 2012

BAKER, C.J., delivered the opinion of the Court, in which
STUCKY, J., and COX, S.J., joined. ERDMANN, J., filed a
separate opinion concurring in part and dissenting in part, in
which RYAN, J., joined.

<u>Counsel</u>

For Appellant: <u>Daniel Conway</u>, Esq. (argued); <u>Lieutenant Colonel
Jonathan F. Potter</u> and <u>Major Richard E. Gorini</u> (on brief);
<u>Captain Matthew T. Grady</u>.

For Appellee: <u>Captain Chad M. Fisher</u> (argued); <u>Lieutenant
Colonel Amber J. Roach</u> (on brief); <u>Major Katherine Gowel</u>.

Military Judge: R. P. Masterton

**<u>THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION</u>.**

United States v. Vela, No. 12-0194/AR

Chief Judge BAKER delivered the opinion of the Court.

A general court-martial composed of members was convened in Iraq. Contrary to his pleas, Appellant was convicted of unpremeditated murder, making a false official statement, and wrongfully placing a weapon with the remains of an Iraqi national, in violation of Articles 118, 107, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 918, 907, 934 (2006). The adjudged and approved sentence included a dishonorable discharge, confinement for ten years, forfeiture of all pay and allowances, and reduction to pay grade E-1. In a summary disposition, the United States Army Court of Criminal Appeals affirmed the findings and the sentence with the exception of the forfeitures. United States v. Vela, No. ARMY 20080133 (A. Ct. Crim. App. Oct. 13, 2011). We granted review on the following issues:

> I. WHETHER THE MILITARY JUDGE ERRED IN DENYING THE DEFENSE'S MOTION TO DISMISS OR DISQUALIFY UNDER UNITED STATES v. KASTIGAR.
>
> II. WHETHER THE EVIDENCE WAS LEGALLY INSUFFICIENT TO SUPPORT THE FINDINGS OF GUILTY TO CHARGE III.

### FACTS

On the night of May 10, 2007, Staff Sergeant Hensley was the leader of a team of snipers ordered to provide over watch security on a site in Jurf As-Sakhr, Iraq. The site included several houses, one of which was thought to harbor a warlord

suspected of storing and shipping weapons.  The team consisted
of Hensley, Appellant, Sergeant Redfern, Sergeant Hand and
Specialist Sandoval.  They departed their patrol base at about
10:00 p.m. and arrived at the objective between 3:00 a.m. and
3:30 a.m. on the morning of May 11.

After this mission was completed, between 6:30 a.m. and
7:00 a.m., Hensley established a "hide"[1] and organized a rest
plan for the team.  The plan called for one soldier to remain
awake to provide security and monitor the radio while the others
slept.  The hide was about six meters wide and was near a pump
house.  According to Sandoval, he began his watch at about 7:00
a.m., and after about an hour he woke Appellant and handed him
the radio and a 9-millimeter (mm) pistol.  Some time later, he
was awakened by a voice and saw an Iraqi man about three feet in
front of him speaking in Arabic.  Sandoval looked over at
Appellant who was "sitting there with his head down."  Sandoval
called Appellant's name three times before Appellant responded.
The man was motioned into the hide.  Appellant awakened the rest
of the team while Sandoval held the man under guard.  When
Hensley awoke, he searched the man, who was face down at this
point, and placed a knee on his back as he tried to get the man

---

[1] Hensley described a hide as a covered and concealed place to
observe and interdict targets.

3

to quiet down.  No weapons were discovered on the man, and Hensley bound the man's hands with cord.

A short while later, the man's teenage son approached the position and was also ordered into the hide.  After about an hour, the son was released, and Hensley ordered Redfern and Sandoval out of the hide and over to the pump house.  Hensley, Appellant and Hand remained in the hide.  After the boy left, Hensley, still kneeling on the man's back, made several radio transmissions back to the patrol base.  According to Appellant's sworn statement, Hensley "radioed to [the patrol base] that we had a local national walking 400 meters out with an AK-47."  A little while later Hensley asked for permission "to execute a close kill on this guy."  After apparently receiving such permission, Hensley told Appellant to "pull out his 9mm and prep it."  Hensley pulled the man's head scarf over the man's face, asked Appellant if he was ready and then told Appellant to shoot the man.  Appellant complied by firing one shot into the victim's head from about six inches away and fired a second shot that apparently missed.  Hensley testified that after the second shot he, Hensley, "grabbed an AK-47 out of the top map flap of someone's ruck" and "routed the sling on the [victim's] shoulder and I placed it on top of his body."

A short time later, members of the unit's Sensitive Site Exploitation (SSE) team arrived to inspect the site while the

4

sniper team members returned to the patrol base.[2]  It was later determined that the victim was Mr. Ghani Nasr Khudayyer Al-Janabi, an Iraqi national who owned the land on which the sniper team was positioned.  According to the victim's son, Mr. Al-Janabi had apparently come upon the hide on his way to turn on his irrigation pump.

## THE SUFFICIENCY ISSUE

Appellant was charged with wrongfully placing the AK-47 on the body of the victim in violation of Article 134, UCMJ.  The Government's theory was that Appellant aided and abetted Hensley's placement of the weapon on the body.  Appellant argues that the evidence on this offense is legally insufficient; he could not have aided and abetted Hensley because he took no action.  Specifically, Appellant argues that the record fails to establish (1) that he had a duty to interfere in this crime (2) that he took any affirmative step in the commission of the crime and (3) that he was even aware that Hensley placed the weapon on the victim's body.

The test for legal sufficiency is "whether, after viewing the evidence in the light most favorable to the prosecution, any

---

[2] A member of the SSE team testified that the purpose of such teams is to go into a site and conduct an orderly and methodical search for evidence.  Specifically, he stated, "Basically we go in, search a body for evidence purposes, and make sure that every thing [sic] that's on the body goes with the body and nothing is missing when it gets turned over to whoever it's turned over to."

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). "This familiar standard gives full play to the responsibility of the trier of fact . . . to draw reasonable inferences from basic facts to ultimate facts." Id. "[T]he factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution." Id.

Article 77, UCMJ,[3] imposes liability as a principle on one who (1) "assist[s], encourage[s], advise[s], counsel[s] or command[s] another in the commission of the offense"; and (2) "share[s] in the criminal purpose of design." United States v. Gosselin, 62 M.J. 349, 352 (C.A.A.F. 2006) (citation and quotation marks omitted); United States v. Thompson, 50 M.J. 257, 259 (C.A.A.F. 1999). The elements of aiding and abetting are:

> (1) the specific intent to facilitate the crime by another;
>
> (2) guilty knowledge on the part of the accused;
>
> (3) that an offense was being committed by someone; and
>
> (4) that the accused assisted or participated in the commission of the offense.

Gosselin, 62 M.J. at 351-52.

---

[3] 10 U.S.C. § 877 (2006).

United States v. Vela, No. 12-0194/AR

"Our case law has generally interpreted Article 77[, UCMJ,] to require an affirmative step on the part of the accused." Thompson, 50 M.J. at 259.  The accused must "in some sort associate himself with the venture, in that he participate in it as in something that he wishes to bring about, [and] that he seek by his action to make it succeed."  United States v. Mitchell, 66 M.J. 176, 178 (C.A.A.F. 2008); United States v. Pritchett, 31 M.J. 213, 217 (C.M.A. 1990).  However, while mere presence is not enough to impose liability as an aider or abettor, United States v. McCarthy, 11 C.M.A. 758, 761, 29 C.M.R. 574, 577 (1960):

> [i]n some circumstances, inaction may make one liable as a party, where there is a duty to act.  If a person . . . has a duty to interfere in the commission of an offense, but does not interfere, that person is a party to the crime if such noninterference is intended to and does operate as an aid or encouragement to the actual perpetrator.

Gosselin, 62 M.J. at 353 (quoting Manual for Courts-Martial, United States pt. IV, para. 1.b.(2)(b)(ii) (2008 ed.)). Finally, intent, like other mental states can be shown by circumstantial evidence.  United States v. Davis, 49 M.J. 79, 83 (C.A.A.F. 1998).

In this case, the members were instructed that, "An aider and abettor must knowingly and willfully participate in the commission of the crime as something he wishes to bring about and must aid, encourage, or incite the person to commit the

7

criminal act." Regarding the evidence in the case, the members were properly instructed that even though they must keep the evidence of each offense separate, "[i]f evidence has been presented which is relevant to more than one offense, you may consider that evidence with respect to each offense to which it is relevant." This is an accurate statement of the law and Appellant has not challenged the military judge's instructions. See United States v. Haye, 29 M.J. 213, 215 (C.M.A. 1989); United States v. Hogan, 20 M.J. 71, 72 (C.M.A. 1985).

The record, including facts drawn directly from Appellant's statement, indicates that Appellant's conduct, before and after Hensley placed the weapon, support a conclusion that Appellant had the requisite specific intent and knowledge for aiding and abetting in this instance. Rational court members could have found that Appellant was only feet from Hensley who, while actively restraining the bound victim, falsely informed the patrol base that a local national was walking 400 meters out with an AK-47 and then asked to execute a "close kill." They could have further found that after the false radio transmissions to the base, Hensley told Appellant to "prep" his 9mm and then asked Appellant if he was ready -- presumably ready to shoot the victim. Appellant also lied to members of the Criminal Investigative Division (CID) consistent with Hensley's false version of events that Hensley shared with him before

Appellant spoke with investigators.  Rational court members could have concluded that both soldiers intended to kill Mr. Al-Janabi and stage the scene to make it appear that he was the combatant earlier described as carrying an AK-47.  Appellant completed his part by taking the affirmative act of shooting the victim in the head.  Hensley completed his part by staging the weapon on the body.  Appellant casts his conduct as inaction without a duty to interfere, but the evidence, as noted above, is to the contrary.  Appellant participated in the offense by setting the stage for the offense and later participating in the cover-up of the incident.  See United States v. Richards, 56 M.J. 282, 285 (C.A.A.F. 2002) (finding a conviction for voluntary manslaughter legally sufficient where the accused set the stage by assaulting the victim before and after the victim was stabbed by the accused's friend); United States v. Shearer, 44 M.J. 330, 335 (C.A.A.F. 1996) (upholding guilty plea where accused aided and abetted friend in fleeing the scene of an accident because, among other things, he helped to form a cover-up for the accident).

The members might also have reasonably concluded that the discrete act of placing the weapon on the body of Mr. Al-Janabi was wrongful, not just because it covered up a crime, but because it could reasonably have caused United States forces to reach erroneous conclusions about the strength and location of

enemy combatants as well as put local civilians at risk. While the murder of Mr. Al-Janabi and the placement of the weapon were charged in a discrete manner, the members were free to review all the evidence in determining whether Appellant was guilty of the offenses.

Based on this evidence as a whole, rational court members could have concluded beyond a reasonable doubt that Appellant had the specific intent to facilitate Hensley's act of placing the weapon with the body, and that he actively participated in Hensley's staging of the scene by ensuring the death of Mr. Al-Janabi.

## THE IMMUNITY ISSUE

Background[4]

Following investigation into Mr. Al-Janabi's death the Government brought charges against Appellant, Hensley, and Sandoval. Colonel (COL) Allen was the staff judge advocate (SJA) for the general court-martial convening authority and Captains Rykowski and Haugh were detailed as trial counsel for the cases. Charges were preferred against Appellant on July 2, 2007. Appellant waived his right to an Article 32, UCMJ,[5] investigation, and the charges were referred to trial on August

---

[4] This background section is taken from the military judge's "Essential Findings and Ruling."

[5] 10 U.S.C. § 832 (2006).

10

6, 2007. Around the middle of September, before Appellant was granted immunity on September 19, COL Allen advised Captains Rykowski and Haugh that they were no longer detailed to Appellant's case and that they were not to discuss the Hensley and Sandoval cases with anyone else in the office, to include himself and the new prosecutors that were to be assigned to Appellant's case. After COL Allen's discussion with Captains Rykowski and Haugh, on September 20, 2007, a grant of immunity and an order to testify in the Sandoval case was served on Appellant.[6]

On September 25, 2007, the evidence in Appellant's case was sealed. This evidence consisted of several confessions taken from Appellant the previous June, statements of others in the unit corroborating the confessions and the CID reports related to the case. All of the sealed evidence had been prepared prior to Appellant's grant of immunity. On September 27, 2007, COL Allen detailed Captains Nef and Young as trial counsel in Appellant's case.[7] COL Allen advised these two officers not to discuss the case with the prosecutors in the Hensley and

---

[6] A grant of immunity and an order to testify was subsequently served on Appellant prior to his testimony in the Hensley case as well.

[7] Later, Captain Young redeployed to the United States and Major Kuhfahl replaced him on the case.

11

Sandoval cases and not to learn anything relating to Appellant's immunized testimony.

That same day, Appellant testified in the Sandoval case. He testified consistently with his prior statements to CID in which he described his and Hensley's actions in the hide and his shooting of the victim. On November 6, 2007, Appellant testified in the Hensley case. Again, his testimony was consistent with his prior admissions concerning how he shot and killed the victim. However, during this testimony, Appellant claimed that he did not recall Hensley making any statements to him before he shot the victim.

In September as well, Appellant prevailed on a motion for relief on the basis that his Article 32, UCMJ, waiver was involuntary. As a result, the charges were withdrawn and an Article 32, UCMJ, investigation was ordered. The Article 32, UCMJ, investigation was held on November 20, 2007, and the same charges that were referred to trial in August were again referred to trial on November 26, 2007.

The defense moved to dismiss the charges, or in the alternative to disqualify trial counsel, on Kastigar grounds. See Kastigar v. United States, 406 U.S. 441 (1972); United States v. Mapes, 59 M.J. 60 (C.A.A.F. 2003). Appellant argued that the Government used his immunized testimony to prosecute him.

12

In response, the military judge considered testimony from COL Allen, Captains Rykowski, Haugh and Nef, and Special Agent Mitchum of CID, the lead agent in Appellant's case. The thrust of COL Allen's testimony was that he had not been exposed to Appellant's immunized testimony, he had not exposed the convening authority to immunized testimony during the referral in Appellant's case, and that he had no discussions with the trial counsel detailed to Appellant's case regarding Appellant's immunized testimony after the grant of immunity. Captain Haugh testified that after Appellant's grant of immunity, he did not discuss Appellant's case with COL Allen or the new prosecutors, nor did he discuss the substance of Appellant's immunized testimony in the Sandoval and Hensley cases. Similarly, Captain Nef testified that he had not discussed Appellant's immunized testimony with the prosecutors in the Hensley and Sandoval cases nor had he been exposed to Appellant's testimony. On these relevant points, Captain Rykowski's testimony was consistent with the testimony of COL Allen, and Captains Nef and Haugh. Special Agent (SA) Mitchum testified that as the lead agent in the case, he had had no discussions with COL Allen or any of the prosecutors detailed to Appellant's case after Appellant was immunized.

The military judge concluded that the Government met its burden demonstrating no direct or indirect use of Appellant's

13

immunized testimony to prosecute Appellant.  The military judge's specific findings, framed around the factors set out in Mapes, were as follows:

    a. The accused's immunized statements reveal nothing that was not already known to the government by virtue of the accused's own pretrial statements.

    b. The investigation against the accused was completed prior to the immunized statement.  The only portion of the investigation that was completed after the grant of immunity was a final report that simply summarized statements and similar documents that were gathered before the grant of immunity.  The accused's immunized statement did not affect the investigation in any way.

    c. The decision to prosecute the accused [had] been made long before his immunized statements were made.  The convening authority and his legal advisors made the decision to send the accused's case to a general court-martial in August 2007 based essentially on the same evidence that was the basis for the November referral.

    d. The trial counsel who had been exposed to the immunized statement did not participate in the prosecution of the accused's case in any way.  Once immunity had been granted a wall was effectively built between the prosecutors in the Sandoval and Hensley cases (Rykowski and Haugh) and the other legal advisors in the . . . legal office and the convening authority.  The prosecutors in the current case (Nef and Kuhfahl) have not been exposed to the immunized testimony in any way.

On appeal to this Court, Appellant renews his trial arguments focusing on the Mapes factors.

Analysis

The Fifth Amendment's privilege against self-incrimination provides that "'[n]o person . . . shall be compelled in any criminal case to be a witness against

14

himself.'" Mapes, 59 M.J. at 65 (alteration in original). "[I]mmunity from the use of compelled testimony and evidence derived therefrom is coextensive with the scope of the privilege" and "is sufficient to compel testimony over a claim of the privilege." Kastigar, 406 U.S. at 452-53. The government may prosecute an immunized witness where it can demonstrate that it has made neither direct nor indirect use of the testimony. United States v. Morrissette, 70 M.J. 431, 438 (C.A.A.F. 2012). The government must affirmatively prove by a preponderance of the evidence that its evidence "is derived from a legitimate source wholly independent of the compelled testimony." Kastigar, 406 U.S. at 460. The grant of immunity must leave the witness and the government in "'substantially the same position as if the witness had claimed his privilege in the absence of a state grant of immunity.'" Id. at 457 (quoting Murphy v. Waterfront Comm'n, 378 U.S. 52, 79 (1964)).

Whether the Government has shown, by a preponderance of the evidence, that it has based Appellant's prosecution on sources independent of the immunized statements is a preliminary question of fact. Morrissette, 70 M.J. at 439; Mapes, 59 M.J. at 67. We will not overturn a military judge's resolution of this question unless it is clearly erroneous or is unsupported by the evidence. Morrissette, 70 M.J. at 439. In reviewing for clear error, we must ask "whether, on the entire evidence, [we

15

are] left with the definite and firm conviction that a mistake has been committed." Easley v. Cromartie, 532 U.S. 234, 242 (2001) (citation and quotation marks omitted).

Since Appellant takes particular issue with each of the military judge's conclusions on the four Mapes factors, we discuss each of them in order.

The first factor is whether Appellant's immunized testimony revealed anything not already known to the Government. Appellant argues that the Government's theory, that Sandoval was not in the hide site at the time of the shooting, is information gleaned from his immunized testimony. However, this argument ignores the fact that Appellant's own statement of June 25, 2007, which was included in the sealed materials, states that Sandoval was not in the hide site.

Appellant also asserts that the Government used his immunized testimony in the prior two courts-martial to decide to amend the charges before trial from premeditated murder to unpremeditated murder. However, at the Article 39(a), UCMJ, 10 U.S.C. § 839(a) (2006), session when the trial counsel moved to amend, the defense indicated that it had no objection and did not pursue this claim during the Kastigar hearing. Appellant also asserts that CID agents learned from lawyers in the SJA's office that the defense might be considering an insanity defense, and was able to interview potential witnesses with an

eye toward this theory. The problem here is that SA Mitchum,
testified that he never spoke to COL Allen or the prosecutors in
Appellant's case about Appellant's prior testimony.
Furthermore, there were other indicators suggesting the
Appellant might raise such a defense, including defense
counsel's request for a forensic psychologist, a request for a
sanity board and references in the file to post-traumatic stress
disorder.

The second factor considers whether the investigation, as
it pertained to Appellant, was completed prior to Appellant's
immunized testimony. The military judge found that the
investigation, as it pertained to Appellant, was concluded prior
to Appellant's immunized statement, and this finding is
supported by Captain Nef's testimony concerning the contents of
the CID file that he received when he was detailed to the case.
In particular, Captain Nef testified that he remembered seeing
SA Mitchum's final report of investigation which had been
prepared after September 19, 2007. He stated that this document
was basically a table of contents of the CID file that had been
prepared before Appellant's immunity grant.[8] He also stated that

---

[8] The military judge erroneously stated in his findings that this
document was issued on October 13, 2007. The document itself,
however, is dated October 3, 2007.

17

this document had no relationship to Appellant's immunized testimony.

Appellant further argues that the investigation was incomplete because the Government did not locate the victim's son until after he, Appellant, testified in the Sandoval case. However, Appellate Exhibit XIII contains an entry by an investigator that data concerning the boy was entered on July 4, 2007. Further, Appellant's statement of June 25, 2007, contains detailed information about the boy and how Appellant and Hensley interacted with him. There is no evidence that Appellant testified to the specific whereabouts of the boy and that the Government acted on that information.

Regarding the third factor, the military judge found that the decision to prosecute Appellant was made long before he gave any immunized testimony, and this finding is amply supported by the documentary evidence and the testimony of COL Allen that the re-referral of charges in November was based on the same evidence as the original August referral. Likewise, regarding the fourth factor, the military judge's finding that the prosecutors in Appellant's case were not exposed to immunized testimony is supported by the lengthy testimony of all the witnesses at the hearing. We conclude that none of these findings is clearly erroneous. Accordingly, we hold that the

United States v. Vela, No. 12-0194/AR

military judge did not err in concluding that the Government had met its burden under Kastigar and Mapes.

DECISION

The decision of the United States Army Court of Criminal Appeals is affirmed.

19

ERDMANN, Judge, with whom RYAN, Judge, joins (concurring in part and dissenting in part):

I concur with the majority's determination that the military judge did not err in denying the motion to dismiss the charges or to disqualify trial counsel based on Kastigar v. United States, 406 U.S. 441 (1972). I respectfully dissent, however, from the majority's conclusion that the evidence in this case is legally sufficient to convict Vela under Article 134, UCMJ, 10 U.S.C. § 934 (2006), of wrongfully placing an AK-47 on the body of Ghani Nasr Khudayyer Al-Janabi. While the majority is correct in stating the panel members were free to examine all evidence presented in the case when rendering their verdict, there is no evidence from which a reasonable panel member could infer that Vela placed the weapon himself, knew Hensley was going to place a weapon on Al-Janabi's body, assisted Hensley in placing the weapon, or had a duty to prevent Hensley from committing the act. Accordingly, I would set aside the findings as they pertain to this charge and specification.

The starting point in any legal sufficiency analysis is to compare the plain language of the charge and specification with the evidence presented at trial. The charge and specification here alleged a discrete act -- that Vela wrongfully placed an AK-47 on Al-Janabi's body and that conduct was to the prejudice of good order and discipline in the armed forces or of a nature

to bring discredit upon the armed forces.  At trial, Hensley testified that he placed the AK-47 on Al-Janabi's body and that Vela did not know about the AK-47, nor did he assist Hensley in placing the weapon on Al-Janabi's body.  This is consistent with Vela's statements to CID.  Additionally, Hensley testified that he did not discuss the "cover-up" story with the members of his unit until after they returned to base.  While the specification charged Vela with wrongfully placing an AK-47 on Al-Janabi's body, there was no evidence to support that Vela did so.  The Government, however, proceeded under an aiding and abetting theory both at trial and before this court.

In order to convict under an aiding and abetting theory, the Government must show:  (1) specific intent to facilitate the commission of the crime by another; (2) guilty knowledge on the part of the accused; (3) that an offense was being committed by someone; and (4) that the accused assisted or participated in the commission of the crime.  United States v. Gosselin, 62 M.J. 349, 351-52 (C.A.A.F. 2006).  To be convicted, the aider must share the criminal intent to commit the crime with the principal.  United States v. Pritchett, 31 M.J. 213, 216 (C.M.A. 1990).  Our case law has generally required the defendant to take an affirmative step to assist in the crime, but failure to act when there is a duty to prevent the crime can also be sufficient to establish intent to aid and abet.  Gosselin, 62

2

M.J. at 352; United States v. Simmons, 63 M.J. 89, 93 (C.A.A.F 2006). The existence of a duty to prevent the crime, however, does not per se establish a shared purpose to commit the crime. Simmons, 63 M.J. at 93. Additionally, mere presence at the scene of the crime is not enough to prove aiding and abetting, even though it is a factor to be considered in deciding whether the evidence meets the elements of aiding and abetting. Pritchett, 31 M.J. at 217 (noting that presence is a factor, but that the court "still must examine the record for other evidence of [A]ppellant's purposeful association with [the crime] and some act of participation, assistance, or encouragement of [the crime]").

In its brief, the Government states Vela's actions after the incident, including lying to CID about the events surrounding the murder, provide a legally sufficient basis on which a rational panel member could infer that Vela intended to commit the crime of wrongfully placing an AK-47 on Al-Janabi's body. However, this argument ignores the evidence that Vela had no knowledge that Hensley had an AK-47 and intended to place it on Al-Janabi's body, as well as the fact that covering up the murder was not discussed until well after the incident occurred. A person cannot form the requisite intent to aid and abet another in committing a crime without knowledge that the other party intends to commit the crime. Simmons, 63 M.J. at 93.

3

Contrary to the Government's argument, Vela's collusion with Hensley to murder Al-Janabi is not sufficient to infer he also knew of or agreed to Hensley's actions in placing the AK-47 on Al-Janabi's body. Gosselin, 62 M.J. at 352 (an affirmative act, which provides assistance for one offense, does not "translate into an affirmative act for [a] later separate offense").

The majority asserts that a rational panel member could find the requisite intent to kill Al-Janabi and stage the scene by examining Vela's actions before, during, and after the murder and placement of the weapon. It goes into great detail discussing the different interpretations of the evidence panel members could have used to reach their verdict, including the suggestion that Vela intended to facilitate Hensley's commission of a minor crime -- the placing of the weapon -- by committing a major crime -- the killing Al-Janabi. This is similar to the Government's theory that the "affirmative step" Vela took in order to aid and abet Hensley's wrongful placement of the weapon was to murder Al-Janabi. This analysis strains logic.

There is nothing to support the contention that Vela's actions at the hide site were the result of an intention to aid and abet Hensley in covering up the murder of Al-Janabi by placing the AK-47 on the victim's body. The majority's reliance on United States v. Richards, 56 M.J. 282 (C.A.A.F. 2002), and United States v. Shearer, 44 M.J. 330 (C.A.A.F. 1996), is not

4

persuasive.  In Richards, this court held that while Richards did not know his codefendant had a knife and intended to use it to assault the victim, Richards' intent to aid and abet could be inferred provided Richards intended the consequence of the principal's actions.  Richards, 56 M.J. at 286.  This is distinguishable from Vela's case because while a rational factfinder could conclude someone who was actively and continuously assaulting a helpless victim intended that the victim be harmed (as was the case in Richards), there is no logical way to conclude Vela intended that Hensley would cover-up the murder by planting an AK-47 on the victim after Vela shot him, when Vela had no knowledge of that weapon or Hensley's intent when he shot Al-Janabi.  As for Shearer, while it is true that this court found Shearer aided and abetted the fleeing of the accident scene by helping to cover up the accident, that case is distinguishable from Vela's because Shearer actively encouraged and participated in fleeing the scene and the cover up of the accident as it was occurring.  That is not the case with Vela.

Nor is there any evidence that Vela had a duty to prevent Hensley from placing the weapon.  The evidence proves beyond a reasonable doubt that Vela killed Al-Janabi at Hensley's direction.  But that is where Vela's participation ends.  There is simply no evidence from which a reasonable panel member could

infer that Vela intended to assist Hensley in placing the weapon on Al-Janabi's body and actually assisted or participated in that discrete act. Without this essential element of the crime, the charge cannot stand.

A more appropriate charge against Vela may have been obstruction of justice, in which the accused commits an act with the belief that there are or will be criminal charges against him and that act is intended to "influence, impede, or otherwise obstruct the due administration of justice." Manual for Courts-Martial, United States pt. IV, para. 96.b.(1-3) (2008 ed.). Vela's actions during the subsequent criminal investigation may have supported an intent to impede the investigation at that time by lying about what actually happened at the hide site.

While there may be evidence from which a reasonable panel member could have found Vela guilty of obstruction of justice, that is not the crime with which he was charged. Therefore I would find the conviction for placing the AK-47 on Al-Janabi's body to be legally insufficient.