*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
GASTON, STEWART, and HOUTZ
Appellate Military Judges

_____

**UNITED STATES**
*Appellee*

**v.**

**Ray D. BRAIMER**
Chief Intelligence Specialist (E-7), U.S. Navy
*Appellant*

**No. 201900271**

Decided: 29 March 2021

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judges:
Derek D. Butler (arraignment)
Hayes C. Larsen (motions and trial)

Sentence adjudged 18 April 2019 by a general court-martial convened at Naval Station Norfolk, Virginia, consisting of officer and enlisted members. Sentence approved by the convening authority: reduction to E-1, confinement for two years, and a dishonorable discharge.

For Appellant:
*Lieutenant Commander Christopher K. Reidel, JAGC, USN*

For Appellee:
*Lieutenant Gregory A. Rustico, JAGC, USN*
*Lieutenant Joshua C. Fiveson, JAGC, USN*

Senior Judge GASTON delivered the opinion of the Court, in which Judges STEWART and HOUTZ joined.

---

**PUBLISHED OPINION OF THE COURT**

---

GASTON, Senior Judge:

Appellant was convicted, contrary to his pleas, of attempted abusive sexual contact, sexual harassment, sexual assault, and abusive sexual contact, in violation of Articles 80, 92, and 120, Uniform Code of Military Justice [UCMJ], 10 U.S.C. §§ 880, 892, 920 (2012), in connection with incidents during two port calls while he was serving aboard USS *Donald Cooke* (DDG 66).

He asserts 12 assignments of error [AOEs], which we renumber as follows: (1) the military judge erred when he refused to allow Appellant's trial defense counsel to cross-examine one of the victims with a specific instance of untruthfulness; (2) the military judge erred in denying a Defense request for a mistake-of-fact instruction for the charge of attempted abusive sexual contact; (3) the trial counsel committed prosecutorial misconduct when he improperly referred to suppressed evidence and during rebuttal argument characterized Appellant's trial defense counsel's cross-examination as "shoving words into someone's mouth" and vouched for his co-counsel; (4) the evidence is legally and factually insufficient to support Appellant's convictions for abusive sexual contact, as well as (5) sexual harassment and (6) attempted abusive sexual contact; (7) Appellant's discovery rights were violated when the Government failed to disclose fingerprint evidence supporting Appellant's description of events; (8) Appellant was improperly denied his statutory right to counsel of his choice;[1] (9) Appellant's trial defense counsel were ineffective in failing to obtain and present at trial any prosecutorial merits memorandum memorializing the Irish Government's reasons for declining to prosecute Appellant; (10) the Government improperly failed to turn over the actual physical evidence to the Defense; (11) the evidence is legally and factually insufficient to support Appellant's conviction for all of

---

[1] We have considered this AOE, submitted pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), and deny it pursuant to *United States v. Cooper*, 78 M.J. 283 (C.A.A.F. 2019). *United States v. Matias*, 25 M.J. 356, 363 (C.M.A. 1987).

the charges; and (12) the cumulative errors at trial substantially impaired the fairness of Appellant's trial.[2]

We find merit in Appellant's fifth AOE and set aside his conviction for sexual harassment in violation of Article 92, UCMJ. We affirm the remaining findings and, upon reassessment, affirm the sentence.

## I. BACKGROUND

While their ship, the *Donald Cooke*, was making a port visit in Souda Bay, Greece, Appellant sat down next to Gunner's Mate Second Class [GM2] (E-5) Allen[3] on a liberty bus that was returning to the ship around midnight. During the bus ride, he placed his hand on GM2 Allen's leg and rubbed her knee and upper thigh for around 30 seconds. When she moved her leg away, he leaned in close to her, took a deep breath, asked if she was wearing perfume, and told her she smelled good. GM2 Allen did not tell Appellant she objected to his conduct, but she sent contemporaneous text messages to a friend stating that what he was doing made her feel "awkward and uncomfortable."[4] When the bus got back to the ship, she appeared "freaked out" about what happened.[5] A couple of days later she reported Appellant's conduct to the chain of command and spoke to Chief Master-at-Arms [MAC] (E-7) Wilson, whom she told she was not sure whether the touching of her knee had been intentional, but that it had made her uncomfortable.

Two months later, when the ship made a port visit to Cork, Ireland, Appellant met and talked with Culinary Specialist Third Class [CS3] (E-4) Sierra and CS3 Warren while riding a local bus to Dublin. When they reached Dublin, although CS3 Sierra and CS3 Warren had already booked a hotel room, they decided to go with Appellant and his liberty buddy to find a hotel, where they got rooms on different floors. After they checked in, CS3 Sierra and CS3 Warren met Appellant in the hotel bar and drank a round of tequila shots that he bought for them, before they went out to a nightclub on their own. When the two women returned later that night, they saw Appel-

---

[2] We have considered Appellant's ninth, tenth, eleventh, and twelfth AOEs, submitted pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), and find them without merit. *United States v. Matias*, 25 M.J. 356, 363 (C.M.A. 1987).

[3] All names in this opinion, other than those of Appellant, the judges, and counsel, are pseudonyms.

[4] Pros. Ex. 1.

[5] R. at 732.

lant at another bar in the hotel and sat down with him again. The three of them talked and laughed for a couple of hours while consuming several rounds of alcohol. At CS3 Sierra's suggestion, they started playing a drinking game, "Never Have I Ever," which devolved into discussing sexually-charged subjects.

As the night wore on, Appellant started becoming more "touchy-feely" with both women, particularly CS3 Sierra, who was not receptive to his advances. When CS3 Warren left to go to the bathroom, Appellant grabbed CS3 Sierra's hand and then gave her a hug, both of which she politely pulled away from. He told her how beautiful she was and asked her to come back to his room with him, saying he hated the Navy's fraternization policy because it prevented him from being with any woman he found attractive because of pay grade. He showed her his midsection and pulled her hand toward it, and tried to put his hand on her midsection when she did the same. She rejected these advances. After the three left the bar around 0330 to go up to Appellant's room to get an electrical adapter for CS3 Sierra's cell phone, Appellant put his hands on CS3 Sierra's hips when they reached the elevators. She pulled away from him.

When the group arrived at Appellant's room, CS3 Warren and CS3 Sierra lay down on his bed while he used the bathroom. They talked to Appellant about the differences between his hotel room and its bathroom and theirs. CS3 Sierra then fell asleep on his bed, at which point CS3 Warren and Appellant went back downstairs to continue drinking.

When they got back to the hotel bar, Appellant started making advances toward CS3 Warren, at various points touching her hand, hugging her, and kissing her cheek. She let him hold her hand for a period of time and hugged him back for a while, but felt awkward about what was happening. When he propositioned her for sex, she told him he "was a risk that [she] wouldn't take professionally or personally."[6] By the time they left the bar a little after 0400, Appellant was so intoxicated he was stumbling and could barely keep his eyes open.

The two returned to Appellant's room and got CS3 Sierra out of Appellant's bed, and then Appellant accompanied them to CS3 Sierra and CS3 Warren's room, ostensibly to see the differences they had discussed between his room and theirs. When they got there, Appellant went into the bathroom while CS3 Sierra got into her bed and fell asleep. Appellant then

---

[6] R. at 1158.

sat down in a chair at the foot of CS3 Sierra's bed, and CS3 Warren then turned out the lights and got in her own bed. After a while, Appellant got up, took off his pants and shirt, got on top of CS3 Sierra in her bed, and started kissing her neck and telling her to come to his room. CS3 Sierra woke up, pushed his face away as he continued to try to kiss her, and then nodded off again.

At that point, CS3 Warren turned the lights on and told Appellant to get off of CS3 Sierra, put his clothes on, and leave. He started gathering his things and told her the lights were too bright. When CS3 Warren turned the lights off again, he went over to CS3 Warren's bed, pulled the covers off her, and started pulling down her leggings as she tried to keep them up and told him to stop. He succeeded in pulling down her leggings and underwear, got on top of her, and put his penis in her vagina, kissing her, and putting his tongue down her throat as she was telling him "no" and trying to push him off. As she tried to get away, she fell off the bed and onto her stomach on the floor, where Appellant got on top of her and started pressing his penis against her anus, at which point her protestations became louder.

CS3 Sierra awoke to the sound of CS3 Warren crying and saying "no" and "stop." She saw Appellant on top of CS3 Warren on the floor beside her bed, yelled at Appellant to get off of her, and smacked him in the head several times until he did so. She accused him of raping CS3 Warren, which he denied. She then yelled at him repeatedly to "get out" (loudly enough for other hotel guests in nearby rooms to hear) until he left the room. Afterwards, CS3 Warren was crying on the floor and did not want to be touched. She called her godmother, but was crying so much she was unable to verbalize what had just happened. After she hung up, she reported what happened to CS3 Sierra, who called the ship and reported that CS3 Warren had been raped.

The Irish police, or "Garda," were notified and responded to the hotel room, where they found CS3 Warren looking "upset," "distressed," and "confused."[7] The Garda collected physical evidence from the hotel room, including fingerprint evidence from the bathroom, and video footage from the hotel security cameras, which captured the parties' interactions in the hotel bar and at the elevators. CS3 Warren underwent a Sexual Assault Nurse Examination [SANE], which found no injuries but collected DNA evidence. Subsequent forensic analysis revealed that male DNA found in CS3 Warren's vaginal area was a statistical match for Appellant's DNA.

---

[7] R. at 741.

When interviewed by the Garda, Appellant waived his rights and said he had consensual sex with CS3 Warren. He said CS3 Sierra and CS3 Warren were being flirtatious and making sexual insinuations at the hotel bar. He denied flirting or making any sexually-charged comments himself. He said he had agreed to escort the women safely from the bar back to their room at their request. He said CS3 Sierra went straight to bed and fell asleep when they got to their room, and he denied climbing into her bed, touching her, or saying anything to her. He said that as he was leaving, CS3 Warren spontaneously started kissing him, pulled down his pants, gave him oral sex, and then pulled him down on top of her on the floor, where they had consensual sex. He said that CS3 Sierra woke up to the noise they were making during sex and that when she asked what was going on, both he and CS3 Warren denied he was raping her. He said CS3 Sierra nevertheless told him she was going to report him for rape.

After the investigation was complete, the Irish Department of Public Prosecutions reviewed the case and declined to prosecute. The Garda investigative file and evidence were turned over to U.S. authorities and made available to the Defense in discovery in connection with Appellant's court-martial. The Defense moved for production of any writing memorializing the Irish government's decision not to prosecute, which the military judge denied, finding among other things that, to the extent such a writing existed, the Garda investigative file was an adequate substitute for any information contained therein.

At arraignment, when advised of his counsel rights, including his right to request individual military counsel [IMC], Appellant and his detailed military defense counsel discussed with the military judge Appellant's intent to request IMC.[8] Appellant subsequently submitted an IMC request, which was denied by the Navy's Chief of Staff, Defense Service Offices, who determined the requested counsel was not reasonably available. When re-advised of his counsel rights just prior to his contested trial, Appellant was represented by three military defense counsel and a civilian defense counsel [CDC], and informed the military judge he did not wish to be represented by any counsel other than those four.

---

[8] R. at 7-10.

## II. DISCUSSION

### A. Curtailment of the Cross-Examination of CS3 Warren

After the assault, CS3 Warren told the SANE nurse she had not been sexually active for ten months prior to the assault. Forensic analysis of the DNA samples taken from CS3 Warren's vaginal area revealed, in addition to Appellant's DNA, trace amounts of non-sperm, male DNA not belonging to Appellant. An expert opined that this evidence was consistent with, but not conclusive proof of, sexual activity with another male in the days leading up to the examination. The Defense moved under Military Rules of Evidence 412 and 608 for a pretrial ruling allowing it to cross-examine CS3 Warren with this evidence to impeach her credibility, arguing it proved she lied to the SANE nurse about her prior sexual activity. After a hearing, the military judge denied the motion in a written ruling.

Appellant asserts the military judge erred in refusing to allow the Defense to cross-examine CS3 Warren on her statement to the SANE nurse about her sexual history as a specific instance of untruthfulness, arguing it reflected her intent to obscure the truth from investigators. We review rulings to admit or exclude evidence for an abuse of discretion. *United States v. Solomon*, 72 M.J. 176, 179 (C.A.A.F. 2013). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010) (citation and internal quotation marks omitted).

Evidence offered to prove an alleged victim engaged in other sexual behavior is, with limited exceptions, generally not admissible at a trial involving a sexual offense. Mil. R. Evid. 412(b). If after a hearing the military judge determines that the evidence falls within an exception to this rule and the probative value of the evidence outweighs the danger of unfair prejudice to the alleged victim's privacy, the evidence is admissible subject to any parameters specified by the military judge and the Military Rule of Evidence 403 balancing test. Mil. R. Evid. 412(c). One of the rule's exceptions is for "evidence the exclusion of which would violate the constitutional rights of the accused." Mil. R. Evid. 412(b)(1)(C). Such evidence, provided it passes the Military Rule of Evidence 403 balancing test, is admissible if relevant, material, and favorable (i.e., "vital") to the Defense, no matter how embarrassing it may be to the alleged victim. *United States v. Banker*, 60 M.J. 216, 222-23 (2004), *abrogated by United States v. Gaddis*, 70 M.J. 248, 256 (C.A.A.F. 2011).

The exception for constitutionally required evidence encompasses an accused's Sixth Amendment right to confront and cross-examine the witnesses

against him, which includes the right "to impeach, i.e., discredit the witness." *United States v. Ellerbrock*, 70 M.J. 314, 318 (C.A.A.F. 2011) (quoting *Olden v. Kentucky*, 488 U.S. 227, 231 (1988)). However, this right does not extend to "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). Trial judges retain "wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Id.* Thus, an accused does not have "a right to cross-examine a witness on any subject solely because he describes it as one of credibility, truthfulness, or bias. . . . [Rather,] the right to cross-examine is the right to question where the proffer establishes a real and direct nexus to a fact or issue at hand." *United States v. Sullivan*, 70 M.J. 110, 115 (C.A.A.F. 2011).

Here, the issue involves a specific instance of conduct as it relates to a witness' character for truthfulness. Military Rule of Evidence 608(b) gives the trial judge discretion in this area: "the military judge *may*, on cross-examination, allow [such instances] to be inquired into if they are probative of the character for truthfulness or untruthfulness" of the witness. Mil. R. Evid. 608(b) (emphasis added). However, in order to conduct such inquiry, "(1) there must be a good-faith belief by the [proponent of the evidence] that the conduct occurred; and (2) the conduct must relate to instances of untruthfulness." *United States v. Robertson*, 39 M.J. 211, 214 (C.A.A.F. 1994). And even where those criteria are met, the trial court may "exercise discretion and exclude the testimony altogether, depending on the importance or lack of importance of the testimony, the age of the conduct, the relationship of the misconduct to truthfulness or untruthfulness, whether the matter would lead to a time-consuming and distracting explanation on cross-examination or recross-examination and undue prejudice." *Id.* at 215.

While the trial judge has discretion in regard to cross-examination, the rule provides no discretion as it relates to extrinsic evidence, which "is not admissible to prove specific instances of a witness' conduct in order to attack or support the witness' character for truthfulness." Mil. R. Evid. 608(b). The doctrine of "impeachment by contradiction," does allow "showing the tribunal the contrary of a witness' asserted fact [on a collateral matter], so as to raise an inference of general defective trustworthiness." *United States v. Banker*, 15 M.J. 207, 210 (C.M.A. 1983). However, extrinsic evidence for this type of impeachment is only admissible if the collateral matter was raised during the witness' *direct* examination. *Id.*

In this case, the military judge excluded the evidence at issue because he determined the falsity of CS3 Warren's statement was not established by the

DNA evidence alone and involved "multiple ambiguous theories of how that DNA was transferred to her cervix."[9] Citing *United States v. Erikson*, 76 M.J. 231, 234 (C.A.A.F. 2017), and *United States v. McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000), he found that in order for a specific instance of untruthfulness to be inquired into, the statement at issue must be shown to be untruthful, else the conduct is not probative of the witness's truthfulness or untruthfulness. Because the Defense had failed to show that CS3 Warren's statement about her sexual history was in fact false, he determined the evidence's probative value as to CS3 Warren's truthfulness was low and was substantially outweighed by the danger of unfair prejudice and the risk of creating a distracting and time-consuming trial within a trial to determine whether CS3 Warren had indeed been untruthful in her statement to the SANE nurse.

We find the military judge's conclusions reasonable, his weighing of the competing factors thorough, and his analysis supported by the record. As the trace DNA evidence did not establish that CS3 Warren had in fact intentionally lied to the SANE nurse, the Defense did not show that her conduct "relate[d] to [an] instance[ ] of *untruthfulness.*" *Robertson*, 39 M.J. at 214 (emphasis added). Moreover, even if the military judge had in his discretion allowed Appellant to cross-examine CS3 Warren about this purported instance of untruthfulness, Military Rule of Evidence 608(b) would have precluded any attempt to prove her statement was actually untruthful through extrinsic evidence, such as the testimony of a DNA expert. Nor was there foundation for introducing such extrinsic evidence through impeachment by contradiction, because the Defense sought to raise the issue during its cross-examination of CS3 Warren, whereas the law allows extrinsic evidence to be used for such impeachment only where the collateral matter[10] is raised on direct. Accordingly, we find no abuse of discretion by the military judge in excluding this evidence.

## B. Mistake-of-Fact Instruction

Appellant asserts the military judge erred in denying a Defense request for a mistake-of-fact-as-to-consent instruction for the charge of attempted abusive sexual contact upon CS3 Sierra. We review the propriety of instruc-

---

[9] App. Ex. XCIX at 7.

[10] The issue of whether CS3 Warren actually engaged in prior sexual activity with some other unidentified male was a collateral matter, as there was no dispute at trial that sexual intercourse had occurred between Appellant and CS3 Warren; the issue was one of consent.

tions given by the trial court de novo. *United States v. Quintanilla*, 56 M.J. 37, 83 (C.A.A.F. 2001).

A trial court must instruct on the elements of the offenses and any affirmative, or "special," defenses under Rule for Courts-Martial [R.C.M.] 916 that are "in issue." R.C.M. 920(e). "A matter is 'in issue' when some evidence, without regard to its source or credibility, has been admitted upon which members might rely if they choose." R.C.M. 920(e) Discussion. "If an issue has been raised, ordinarily the military judge must instruct on the issue when requested to do so." R.C.M. 920(c) Discussion. Even if not requested, the trial judge has a sua sponte duty to instruct on any defenses reasonably raised by the evidence. R.C.M. 920(e); *United States v. Barnes*, 39 M.J. 230, 232-33 (C.A.A.F. 1994). "A defense may be raised by the defense, the prosecution, or the court-martial. . . . More than one defense may be raised as to a particular offense. The defenses need not necessarily be consistent." R.C.M. 916(b) Discussion; *see also United States v. Simmons*, 38 M.J. 376, 383 (C.A.A.F. 1993) (stating that alternative defenses are not prohibited at courts-martial). "Any doubt whether an instruction should be given should be resolved in favor of the accused." *United States v. Hibbard*, 58 M.J. 71, 73 (C.A.A.F. 2003) (citations and internal quotation marks omitted).

Mistake of fact as to consent is an affirmative defense to the charge of attempted abusive sexual contact. R.C.M. 916(j)(1). This defense provides that "it is a defense to an offense that the accused held, as a result of ignorance or mistake, an incorrect belief of the true circumstances such that, if the circumstances were as the accused believed them, the accused would not be guilty of the offense." *Id.* Because the offense of attempt requires the specific intent to commit the object offense, the mistake of fact need only be honest, not reasonable—i.e., "the ignorance or mistake need only have existed in the mind of the accused." *Id.*

In assessing whether this defense was in issue, "we take into account the manner in which the issue was litigated as well as the material introduced into evidence at trial." *Hibbard*, 58 M.J. at 76. "The defense theory at trial and the nature of the evidence presented by the defense are factors that may be considered in determining whether the accused is entitled to a mistake of fact instruction, but neither factor is dispositive." *Id.* at 73 (citations omitted). Nor must an accused testify in order for a mistake-of-fact instruction to be given. *United States v. Jones*, 49 M.J. 85, 91 (C.A.A.F. 1998). "Although it is not necessary to present evidence of a mistake of fact in the defense case on the merits or to discuss such evidence in closing argument in order to obtain an instruction in a proper case, it is appropriate for an appellate court to take into account the absence of such a presentation in assessing the significance of the evidence." *Hibbard*, 58 M.J. at 76.

Appellant asserts here, as at trial, that the defense of mistake of fact as to consent was raised by the testimony of CS3 Sierra, who stated that she "woke up to [Appellant] on top of [her], kissing [her] neck and telling [her] that he wanted [her] to come to his room with him."[11] Appellant argues this testimony supports that he believed CS3 Sierra was both awake and consenting to his conduct, else he would not have been speaking to her and trying to get her to accompany him back to his room.

In denying the requested instruction, the military judge correctly identified that with respect to defenses "the standard is not what the accused says, the standard is whether it has been reasonably raised by the evidence."[12] He found the evidence pointed to by the Defense insufficient to raise the issue of mistake of fact because the Defense theory as articulated to the members was not based on Appellant's mistake of fact as to consent, but rather, consistent with Appellant's statement to the Irish Garda, was to deny that the conduct CS3 Sierra testified to ever occurred.[13]

We concur with the military judge's conclusion that the defense of mistake of fact as to consent was not reasonably raised for this offense. The evidence for this charge supported that CS3 Sierra was asleep at the time Appellant took off his clothes and got on top of her in her bed, uninvited, and started trying to kiss her and convince her to come back to his room. The simple fact that some evidence suggested that an inebriated Appellant was actively speaking to CS3 Sierra while he was on top of her does not render the defense of mistake of fact *as to consent* "reasonably raised." This is particularly true when considering the ample evidence of CS3 Sierra's demonstrated lack of interest in Appellant's advances throughout the night. Earlier interactions with Appellant at the hotel bar and elevators—which were caught on video by the hotel cameras—gave no indication that she was interested in his advances, such that he would have been honestly mistaken about her consent when he later crawled into the bed in which she lay asleep.

Nor did the way the Defense litigated the case tend to reasonably raise a defense of mistake of fact as to consent. The Defense case was focused entirely on showing, as it maintained in its opening statement, that in reconciling

---

[11] R. at 962.

[12] R. at 1638.

[13] R. at 1639-40. The military judge did, however, agree to instruct on the defense of voluntary intoxication in relation to whether Appellant had the specific intent to commit the object offense of abusive sexual contact.

the objective evidence with the competing accounts of what happened and applying common sense, "the *only* reasonable explanation is . . . the one that [Appellant gave to the Irish Garda],"[14] in which Appellant denied getting in bed with CS3 Sierra, hitting on her, or touching her. While not dispositive per se, we find significant the Defense's laser focus on disproving the acts in question ever happened, including its presentation of evidence to undermine the general credibility of CS3 Sierra, as opposed to challenging that Appellant had the requisite specific intent. Although we recognize that alternative, inconsistent defenses may be raised for the same offense, the record before us does not support that conclusion in this case.

## C. Prosecutorial Misconduct

Appellant asserts the trial counsel committed prosecutorial misconduct when he improperly referred to suppressed evidence and when during his rebuttal argument he characterized Appellant's trial defense counsel's cross-examination of Government witnesses as "shoving words into someone's mouth" and later vouched for his co-counsel. We review prosecutorial misconduct and improper argument de novo. *United States v. Sewell*, 76 M.J. 14, 18 (C.A.A.F. 2017). Where a proper objection was made, we review for prejudicial error. *United States v. Andrews*, 77 M.J. 393, 398 (C.A.A.F. 2018).

Prosecutorial misconduct occurs when a prosecutor "oversteps the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense." *United States v. Fletcher*, 62 M.J. 175, 178 (C.A.A.F. 2005) (quoting *Berger v. United States*, 295 U.S. 78, 84 (1935)). In general, such misconduct is "action or inaction by a prosecutor in violation of some legal norm or standard, e.g., a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon." *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996) (citing *Berger,* 295 U.S. at 88). To assess the prejudicial impact of prosecutorial misconduct on a trial, we look at three factors: "(1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the weight of the evidence supporting the conviction." *Fletcher*, 62 M.J. at 184. Indicators of severity include the number, timing, and frequency of the occurrences, in comparison with the length of the trial and the panel's deliberations, and whether counsel abided by any rulings by the trial judge. *Id.* "[R]eversal is warranted only when the trial counsel's comments, taken as a whole, were so damaging that we cannot

---

[14] R. at 663 (emphasis added).

be confident that the members convicted the appellant on the basis of the evidence alone." *Sewell*, 76 M.J. at 18.

Here, after receiving GM2 Allen's complaint about Appellant's conduct on the liberty bus, MAC Wilson spoke to Appellant about what happened without first advising him of his rights under Article 31(b), UCMJ, and the military judge granted a Defense motion to suppress Appellant's statements to MAC Wilson on that basis. During trial, when the Defense called MAC Wilson to impeach the testimony of GM2 Allen, he began to offer non-responsive testimony regarding his interview of Appellant. The military judge intervened sua sponte and stopped MAC Wilson from further testifying about this conversation. The trial counsel then asked MAC Wilson during cross-examination whether, after speaking with GM2 Allen, he had "approached the accused and talked to him," to which MAC Wilson answered, "Yes, sir."[15] The military judge again interrupted sua sponte and called an Article 39(a), UCMJ, session to address whether the trial counsel intended to elicit testimony about the contents of the suppressed statement. The trial counsel stated he did not and that his intent was only to establish a timeline to show that MAC Wilson's testimony was potentially biased in favor of Appellant. The trial counsel then withdrew his question, and the military judge sustained a Defense objection to any further testimony about the interview.

Later, during his rebuttal argument, in reference to the Defense's cross-examination of Government witnesses, the assistant trial counsel argued that "[t]hey [were] trying to put words in someone's mouth."[16] He subsequently commented, during the same argument,

> The defense counsel then suggests that the Government presentation of evidence is, one, to hide evidence it doesn't like, and then two, that [his co-counsel], a sworn officer of the court, would purposely coach and suborn perjury from a witness or try to elicit testimony he doesn't believe, abandoning his ethical duties.[17]

---

[15] R. at 1533-34.

[16] R. at 1809.

[17] R. at 1821.

The Defense objected, "[T]hat is not what was argued," and the military judge instructed the trial counsel to "move on."[18]

At the conclusion of the rebuttal argument, Appellant's CDC told the military judge, "[W]e didn't object during trial counsel's rebuttal, but there were comments on [Appellant's] right to put on a defense, right to cross-examine witnesses, and burden shifting. We just want to make sure that is reflected in the instructions."[19] The military judge proposed to handle the issues by re-instructing members on the burden of proof, to which CDC stated, "I think an instruction would be fair, Your Honor."[20] The military judge then instructed the members as follows:

> First, I want to remind you, as I discussed yesterday, that [the Accused] is presumed innocent until his guilt is established by legal and competent evidence beyond a reasonable doubt. Second, as I mentioned yesterday, if there is a reasonable doubt of [the Accused], that doubt must be resolved in his favor, he must be acquitted. Lastly, the burden of proof to establish the guilt of the Accused beyond a reasonable doubt is on the Government. The burden never shifts to the Aaccused to establish his innocence or to disprove the facts necessary to establish each element of the offense.

> The Accused, through counsel, has a constitutional right to confront the witnesses called against him. Often this is called cross-examination. That is an entirely appropriate and accepted method of confronting the witnesses called against someone.

> Also, I remind you that closing statements from counsel are not evidence. Their closing statements are simply a commentary on the evidence as they see it. If you believe that you heard trial counsel was vouching for the credibility of or believability of any witnesses, you must disregard that opinion as the final determination of the credibility of the witnesses rests solely with you. Closing arguments and rebuttal by the Government may properly include reasonable comments on the evidence in the case, including reference to be drawn therefrom in support of a parties' theory of the case. The Government coun-

---

[18] *Id.*

[19] R. at 1827.

[20] *Id.*

sel may comment about the testimony, conduct, motives, interests and biases of witnesses to the extent that is supported by the evidence. It is your ultimate responsibility, however, to determine what the facts are. It is your responsibility to determine what the facts are, apply those facts to the law as I have instructed you and then it is your ultimate responsibility, which you will participate in in a moment, to determine whether [Appellant] is guilty or not guilty based solely upon the evidence that is presented before the Court.[21]

We find no prejudicial error in this case, due in large part to the proactive efforts by the military judge. To the extent the actions complained of constitute misconduct, it was not severe, as it consisted only of a single question to a Defense witness, which was subsequently withdrawn, and two isolated remarks during the Government's rebuttal argument in the context of a lengthy, contested general court-martial. We agree that it is impermissible for a trial counsel to vouch for his co-counsel, as "the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather that its own view of the evidence." *United States v. Voorhees*, 79 M.J. 5, 12 (2019) (quoting *United States v. Young*, 470 U.S. 1, 18-19 (1985)). Prosecutors must also take care not to malign the defense counsel's advocacy on behalf of an accused, which may cause the members to decide the case "based on which lawyer they like better," rather than "solely on the basis of the evidence presented, as is required." *Fletcher*, 62. M.J. at 181 (citing *Young*, 470 U.S. at 18).

However, for each of these occurrences, the military judge took decisive action to address and remedy the issue. He intervened during the testimony of MAC Wilson and stopped a potentially impermissible line of questioning before it even began, and he addressed the improper rebuttal comments through appropriately tailored instructions, which we presume absent contrary indications that the panel followed. *United States v. Short*, 77 M.J. 148, 151 (C.A.A.F. 2018) (citation omitted). As we have previously cautioned, "military judges must be quick to act sua sponte to stop improper [prosecutorial] conduct—irrespective of whether it appears intentional or inadvertent—as it occurs in their courtrooms." *United States v. Nichol*, No. 201800286, 2020 CCA LEXIS 178, at *14 (N-M. Ct. Crim. App. May 28, 2020) (unpublished); *see also Andrews*, 77 M.J. at 403-04 ("Military judges are neither mere figurehead[s] nor are they umpire[s] in a contest between the Govern-

---

[21] R. at 1830-32.

ment and accused," and have a "sua sponte duty to [e]nsure that an accused receives a fair trial.") (citations and internal quotation marks omitted). That is precisely what the military judge did here.

Finally, the Government's case against Appellant, particularly for the most egregious offense of sexually assaulting CS3 Warren, was strong.[22] Despite the challenges the Defense made to CS3 Sierra's general credibility, we find her testimony compelling, as it was corroborated not only by the hotel video footage of Appellant's actions at the hotel bar and elevators, but also by other hotel guests who heard her yelling at Appellant to "get out" of her and CS3 Warren's hotel room. CS3 Sierra's testimony, in turn, corroborated CS3 Warren's account of crying and telling Appellant to stop as he was sexually assaulting her. Thus, in light of the curative actions taken by the military judge and the strength of the evidence supporting Appellant's convictions, we are confident that the members convicted Appellant based on the evidence alone and not as a result of any improper conduct or comments by the trial counsel.

## D. Legal and Factual Sufficiency

Appellant asserts the evidence is legally and factually insufficient to support several of his convictions. We review such questions de novo. UCMJ art. 66(c); *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

To determine legal sufficiency, we ask whether, "considering the evidence in the light most favorable to the prosecution, a reasonable fact-finder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In conducting this analysis, we must "draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Gutierrez*, 74 M.J. 61, 65 (C.A.A.F. 2015) (citation and internal quotation marks omitted).

In evaluating factual sufficiency, we determine whether, after weighing the evidence in the record of trial and making allowances for not having observed the witnesses, we are convinced of the appellant's guilt beyond a reasonable doubt. *Turner*, 25 M.J. at 325 (C.M.A. 1987). In conducting this unique appellate function, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence

---

[22] We discuss more fully below the strength of the Government's evidence for the other offenses of which Appellant was convicted.

constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399. Proof beyond a "[r]easonable doubt, however, does not mean the evidence must be free from conflict." *United States v. Rankin,* 63 M.J. 552, 557 (N-M. Ct. Crim. App. 2006).

### 1. Abusive sexual contact upon BM2 Allen

In Specification 3 of Charge I, Appellant was convicted of abusive sexual contact upon GM2 Allen, in violation of Article 120(d), UCMJ. In order to prove this offense, the Government was required to prove beyond a reasonable doubt that (1) Appellant committed sexual contact upon GM2 Allen by rubbing her knee; (2) he did so by causing bodily harm to her, i.e., doing so without her consent; and (3) he did so with the intent to arouse or gratify the sexual desire of any person. *Manual for Courts-Martial, United States* [*MCM*], pt. IV, para. 45.b.(8)(b) (2016 ed.).

Appellant asserts that the proof is lacking for the third element, that Appellant's intent in rubbing GM2 Allen's leg was to arouse or gratify sexual desire. We disagree. "[I]ntent, like other mental states, can be shown by circumstantial evidence." *United States v. Vela*, 71 M.J. 283, 286 (C.A.A.F. 2012) (citation omitted). The evidence here supports that during the liberty bus ride Appellant intentionally placed his hand on GM2 Allen's leg and rubbed her knee and upper thigh for around 30 seconds, and after she pulled away, he leaned in, took a deep breath, and told her she smelled good. We find this circumstantial evidence sufficient proof of the requisite intent.

Considering the evidence in the light most favorable to the Prosecution, we conclude a reasonable fact-finder could have found all the essential elements of this offense, including the intent to gratify sexual desire, beyond a reasonable doubt. The evidence is thus legally sufficient to support the conviction. Regarding factual sufficiency, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we, too, are convinced of Appellant's guilt beyond a reasonable doubt.

### 2. Sexual harassment upon CS3 Sierra

In Specification 2 of Charge II, Appellant was convicted of violating Sec'y of the Navy Instr. 5300.26D (Jan. 3, 2006) [SECNAVINST 5300.26D] , prohibiting sexual harassment, in violation of Article 92, UCMJ. In order to prove this offense, the Government was required to prove beyond a reasonable doubt that (1) a certain lawful general order, i.e., SECNAVINST 5300.26D, was in effect; (2) Appellant had a duty to obey it; and (3) Appellant violated the order by sexually harassing CS3 Sierra by, as charged, telling her she was very beautiful, asking if she wanted to go back to his room, and

stating that he hated the Navy's fraternization policy that prevented him from being with any woman he found attractive because of pay grade. *MCM*, pt. IV, para. 16.b.(1).

"Sexual harassment" is behavior that is "unwelcome, sexual in nature, and connected in some way with a person's job or work environment." SEC-NAVINST 5300.26D, encl. 2, para. 2. It includes "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when [among other things] . . . [s]uch conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creates an intimidating, hostile or offensive work environment." SEC-NAVINST 5300.26D, Encl. (1), para. 3.c. It includes "any military member . . . who makes deliberate or repeated unwelcome verbal comments, gestures, or physical contact of a sexual nature in the workplace." *Id.*

In order to constitute sexual harassment, a person's behavior "must meet three criteria: it must be unwelcome, sexual in nature, and occur in or impact on the work environment." SECNAVINST 5300.26D, encl. 2, para. 3. "Work-place" is "an expansive term for military members and may include conduct on or off duty, 24 hours a day." *Id.* "Work environment" includes "[t]he workplace or any other place that is work-connected," such as "an office, an entire office building, a DoD [Department of Defense] base or installation, DoD ships, aircraft or vehicles, anywhere when engaged in official DON [Department of the Navy] business, as well as command-sponsored social, recreational and sporting events, regardless of location." SECNAVINST 5300.26D, encl. 1, para. 4.

Appellant argues the proof is lacking that his conduct during a private excursion in a foreign country had the purpose or effect of unreasonably interfering with CS3 Sierra's work performance or created an intimidating, hostile, or offensive work environment. We agree. While the definitions of "workplace" and "work environment" are broadly worded under the SECNAV instruction, they are rooted in the idea that either the place or the event in which the conduct occurs is connected in some way to the Navy or DoD. This is consistent with the general requirement that in order to be lawful, an order must have a valid military purpose or connection:

> The order must relate to military duty, which includes all activities reasonably necessary to accomplish a military mission, or safeguard or promote the morale, discipline, and usefulness of members of a command and directly connected with the maintenance of good order in the service.

*MCM*, pt. IV, para. 14.c.(2)(a)(iv).

We have previously held that offensive words or gestures which may constitute sexual harassment in a military work environment are not punishable when the conduct occurs in an off-duty, non-military-related context. *United States v. Peszynski*, 40 M.J. 874, 881 (N-M. Ct. Crim. App. 1994) (finding sexually harassing comments made by off-duty appellant to fellow employees at Pizza Hut, none of whom were part of his unit, did not fall within the Navy's sexual harassment policy). Rather, there must be "an *attendant circumstance* linking the act of harassment to the workplace." *United States v. Murray*, No. 201800163, 2019 CCA LEXIS 483, at *12 (N-M. Ct. Crim. App. Dec. 5, 2019) (unpublished) (emphasis in original). An example of such an attendant circumstance is when harassing comments occur off-duty but while onboard a warship. *See United States v. Olivares*, No. 201800125, 2019 CCA LEXIS 97 (N-M. Ct. Crim. App. Mar. 7, 2019) (unpublished). Even off-base conduct at a private residence can meet this threshold if it is linked to the workplace. *See United States v. Baldwin*, No. 201400014, 2014 CCA LEXIS 847 (N-M. Ct. Crim. App. Nov. 13, 2014) (unpublished) (master sergeant took lance corporal mentee from same command to his off-base residence during lunch hour, where he made inappropriate comments and caressed her hand, which she found offensive and negatively impacted their work relationship).

Here, at the time of the conduct in question, Appellant was on liberty and had taken a local bus to a foreign city hours away from the port where his ship was located. He was staying in a private hotel at his own expense, and was sitting and drinking in the hotel bar at his own expense, at the time he made the remarks at issue. The individual with whom he was talking, CS3 Sierra, was similarly situated. And while they were both attached to the same ship, there is no evidence that they worked in the same work center or the same chain of command or had any interaction prior to being on the same local bus to Dublin, such that Appellant's off-duty conduct could reasonably be said to be "connected in some way with [either his or CS3 Sierra's] job or work environment." SECNAVINST 5300.26D, encl. 2, para. 2. Thus, nothing about the place or "event" in which the conduct at issue occurred bore any relation to the Navy or the DoD or the military duty of either participant.

We conclude that however broadly the terms "workplace" and "work environment" are defined under the SECNAV instruction, they are not so broad as to encompass Appellant's conduct in this context. It is not enough that Appellant and CS3 Sierra were stationed aboard the same ship, or that CS3 Sierra worked at the ship's galley, if the evidence does not support that Appellant's conduct occurred in or impacted on that work environment. While Appellant's seniority might be relevant for other offenses meant to enforce proper senior / subordinate relationships, that fact in and of itself does not establish whether conduct impacts the work environment, such that it constitutes sexual harassment under the instruction. We find the evidence here

fails to satisfy the third criterion of "sexual harassment" required under the instruction—i.e., that the conduct "occur in or impact on the work environment." SECNAVINST 5300.26D, encl. 2, para. 3. Accordingly, we conclude we must set aside the finding of guilty for Specification 2 of Charge II, which we accomplish in our decretal paragraph below.

### 3. Attempted abusive sexual contact upon CS3 Sierra

In the specification of Charge III, Appellant was convicted of attempted abusive sexual contact upon CS3 Sierra in violation of Article 80, UCMJ. In order to prove this offense, the Government was required to prove beyond a reasonable doubt that (1) Appellant did certain overt acts, i.e., as charged, climbed into CS3 Sierra's bed and tried to kiss her without her consent; (2) the acts were done with the specific intent to commit the offense of abusive sexual contact; (3) the acts amounted to more than mere preparation; and (4) the acts apparently tended to effect the commission of the intended offense. *MCM*, pt. IV, para. 4(b). The elements of the attempted offense of abusive sexual contact are that (1) Appellant committed sexual contact upon CS3 Sierra; (2) he did so by causing bodily harm to her, i.e., doing so without her consent; and (3) he did so with the intent to arouse or gratify the sexual desire of any person. 45.b.(8)(b). The term "sexual contact" includes "any touching, or causing another person to touch, either directly or through the clothing, any body part of any person, if done with an intent to arouse or gratify the sexual desire of any person. Touching may be accomplished by any part of the body." *MCM*, pt. IV, para. 45.a.(g)(2)(B).

Appellant asserts that the proof is lacking for the second element, that Appellant had the specific intent to commit abusive sexual contact upon CS3 Sierra. We disagree. Again, "intent, like other mental states, can be shown by circumstantial evidence." *Vela*, 71 M.J. at 286 (citation omitted). Here, the evidence supports that Appellant, while CS3 Sierra was asleep, took off his clothes, got on top of her in her hotel bed, and attempted to kiss her as he was telling her to come back to his room with him. In the context of his earlier sexual advances at the bar, we conclude that this circumstantial evidence, notwithstanding his level of intoxication at the time, supports that Appellant intended to kiss CS3 Sierra, without her consent, to arouse or gratify his sexual desire. We further conclude, contrary to Appellant's argument, that this offense of attempt was complete prior to CS3 Sierra waking up and pushing him away, at which point he stopped any further attempts.

Considering the evidence in the light most favorable to the Prosecution, we conclude a reasonable fact-finder could have found all the essential elements of this offense beyond a reasonable doubt. The evidence is thus legally sufficient to support the conviction. Regarding factual sufficiency,

after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we, too, are convinced of Appellant's guilt beyond a reasonable doubt.

**E. Discovery Violation**

After the Irish Garda collected fingerprint evidence from CS3 Sierra and CS3 Warren's hotel room, fingerprint comparisons were conducted and found no match for Appellant's fingerprints in the bathroom. While the Garda case file and evidence, including the fingerprint lift cards, were turned over to U.S. authorities and later disclosed to the Defense in discovery, any results of the Garda's fingerprint comparisons apparently were not. At trial, the Defense cross-examined a Garda investigator about the results of the fingerprint comparisons, pointing out that the absence of Appellant's fingerprints in the bathroom failed to corroborate CS3 Sierra's account that when they arrived to their room Appellant initially went into their bathroom.[23]

Appellant asserts the failure to disclose this evidence to the Defense violated his discovery rights. For such issues, "first, we determine whether the information or evidence at issue was subject to disclosure or discovery; second, if there was nondisclosure of such information, we test the effect of that nondisclosure on the appellant's trial." *United States v. Roberts*, 59 M.J. 323, 325 (C.A.A.F. 2004). Regarding the latter prong, where the nondisclosure pertains to a general discovery request, or if no request was made, we

---

[23] The cross-examination was as follows:

Q. Sergeant [Kilo], so, you are saying today that the fingerprint cards from the bathroom were tested by the Irish Garda?

A. Yes.

Q. And those test results were provided to the U.S. government?

A. My recollection is that there was no match for the fingerprints.

Q. There was no match of [Appellant] in the bathroom of room 328?

A. To my recollection.

Q. So that evidence does not corroborate CS3 [Sierra's] story to the Garda, does it?

A. That he went into the bathroom?

Q. Correct.

A. No, because it's not there.

R. at 1463.

ask whether there is a reasonable probability that, had the evidence been disclosed, the result of the trial would have been different. *Id*. Where the nondisclosure pertains to a specific request or was a result of prosecutorial misconduct, the Government must show the nondisclosure was harmless beyond a reasonable doubt. *Id*.

Among the Government's discovery obligations is to "disclose to the defense the existence of evidence known to the trial counsel which reasonably tends to: (A) Negate the guilt of the accused of an offense charged; (B) Reduce the degree of guilt of the accused of an offense charged; or (C) Reduce the punishment." R.C.M. 701(a)(6). The scope of due diligence required with respect to governmental files beyond the prosecutor's own files is generally limited to:

> (1) the files of law enforcement authorities that have participated in the investigation of the subject matter of the charged offenses; (2) investigative files in a related case maintained by an entity closely aligned with the prosecution; and (3) other files, as designated in a defense discovery request, that involved a specified type of information within a specified entity.

*United States v. Williams*, 50 M.J. 436, 441 (C.A.A.F. 1999) (citations and internal quotation marks omitted). However, "the parameters of the review that must be undertaken outside the prosecutor's own files will depend in any particular case on the relationship of the other governmental entity to the prosecution and the nature of the defense discovery request." *Id.*

Here, the Defense submitted a request for "any investigative report created by any investigative agency or command related to this case," including but not limited to "[a]ll investigative reports and documents from Irish law enforcement."[24] Based on the record before us, we are unable to ascertain whether the fingerprint comparisons referred to during the Garda investigator's testimony were actually reduced to writing and therefore subject to disclosure. Assuming without deciding that they were, we determine that such evidence would be subject to disclosure under *Williams*.

However, even without access to any fingerprint comparisons conducted by the Garda, the Defense had access to the substantive evidence—the fingerprint cards themselves—and were able to cross-examine the Garda investigator effectively about the absence of Appellant's fingerprints in the victims' bathroom, highlighting the failure of this evidence to corroborate the

---

[24] App. Ex. VII at 7.

victims' testimony in that regard. Thus, while we recognize that pretrial access to discovery materials is important to formulating a Defense strategy, *see United States v. Webb*, 66 M.J. 89, 92 (C.A.A.F. 2008), we find little to indicate such strategy was hampered here. The issue of whether Appellant went into the victims' bathroom—let alone whether he touched anything such that his fingerprints would be found there—was hardly the linchpin of the Government's case regarding Appellant's assaultive conduct in the hotel room itself, where he was admittedly present. In light of the evidence of Appellant's guilt, which we discuss more fully elsewhere, we find any discovery violation in this regard was harmless beyond a reasonable doubt.

**F. Sentence Reassessment**

Having set aside one of Appellant's convictions, we must determine whether we can reassess the sentence at the appellate level or whether we must remand for the trial court to do so. We do so by determining: (1) whether there have been dramatic changes in the penalty landscape or exposure; (2) whether sentencing was by members or a military judge alone; (3) whether the nature of the remaining offenses captures the gravamen of the criminal conduct included within the original offenses and whether significant or aggravating circumstances addressed at the court-martial remain admissible and relevant to the remaining offenses; and (4) whether the remaining offenses are of the type with which appellate judges should have the experience and familiarity to reliably determine what sentence would have been imposed at trial. *United States v. Winckelmann*, 73 M.J. 11, 15-16 (C.A.A.F. 2013).

Here, we determine that we can reassess the sentence. As Appellant's conviction for violation of Article 92 comprised only two years of the maximum sentence of 46 years' confinement, there has been no dramatic change in the penalty landscape or exposure. While Appellant was sentenced by members, the nature of the remaining offenses captures the gravamen of his criminal conduct and does not significantly alter the circumstances of the offenses relevant to sentencing. Finally, the remaining offenses are of the type with which appellate judges have experience to reliably determine what sentence would have been imposed at trial. Under these circumstances, we are confident that the sentence the members would have imposed for the remaining offenses would be the same as the one they originally adjudicated.

## III. CONCLUSION

Appellant's conviction of Specification 2 of Charge II is **SET ASIDE** and **DISMISSED WITH PREJUDICE**. The remaining findings and the sentence are **AFFIRMED**.

Judges STEWART and HOUTZ concur.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court