*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
DALY, GROSS, and de GROOT
Appellate Military Judges

_____

**UNITED STATES**
*Appellee*

**v.**

**Oliver S. HARRIS**
Information Systems Technician Second Class (E-5),
U.S. Navy
*Appellant*

**No. 202300251**

_____

Decided: 4 April 2025

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judges:
Andrea K. Lockhart (arraignment)
Michelle M. Pettit (trial)
Philip J. Hamon (Entry of Judgment)

Sentence adjudged 16 June 2023 by a general court-martial tried at Naval Air Station Lemoore, California consisting of officer and enlisted members with military judge sentencing. Sentence in the Entry of Judgment: reduction in grade to E-1, confinement for three years, and a dishonorable discharge.

For Appellant:
*Mr. Don King*
*Mr. Timothy Ceder*
*Captain Colin P. Norton, USMC*

For Appellee:
*Lieutenant Commander James P. Wu Zhu, JAGC, USN*
*Major Mary Claire Finnen, USMC*

Judge de GROOT delivered the opinion of the Court, in which Senior Judge DALY and Judge GROSS joined.

———————————————————————

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Appellate Procedure 30.2.**

———————————————————————

de GROOT, Judge:

A panel of officer and enlisted members convicted Appellant contrary to his pleas of one specification of attempted rape in violation of Article 80, Uniform Code of Military Justice (UCMJ).[1] The military judge sentenced Appellant to reduction to the grade of E-1, confinement for three years, and a dishonorable discharge.

Appellant asserts two assignments of error: (1) whether Appellant's convictions are legally and factually sufficient and (2) whether the military judge abused her discretion when she admitted evidence of Appellant's prior consensual sexual acts pursuant to Military Rule of Evidence (Mil. R. Evid.) 404(b). We find no prejudicial error and affirm.

---

[1] 10 U.S.C. § 880. Appellant was also found guilty of one specification of attempted sexual assault in violation of Article 80, and one specification of assault consummated by a battery in violation of Article 128, UCMJ. *See* 10 U.S.C. §§ 880, 928. He was acquitted of one specification of assault consummated by battery in violation of Article 128. The military judge conditionally dismissed the specifications of attempted sexual assault and assault consummated by a battery without prejudice until completion of appellate review after the members entered findings.

## I. BACKGROUND

Appellant and a few friends attended a pool party at Information Systems Technician First Class (IT1) Bravo's house to celebrate the Fourth of July.[2] IT1 Remy showed up with her two children and mother. IT1 Remy and Appellant knew each other as work colleagues, as she was his leading petty officer on a past deployment.

Appellant and IT1 Remy flirted, kissed, and played games in front of others.[3] This included playing a drinking game where IT1 Remy was dared to cut Appellant's boxer brief underwear to look like jockey shorts. Both were intoxicated. IT1 Bravo, who was in the pool area, testified that Appellant and IT1 Remy were kissing in the pool prior to IT1 Remy saying out loud that she was going to go to the bathroom. Shortly after IT1 Remy left, Appellant followed her. IT1 Remy testified she did not invite him or do anything to indicate she wanted him to follow her.

As she came out of the enclosed toilet area of the bathroom into the sink area, IT1 Remy saw Appellant standing there. She tried to get past him to wash her hands when he started kissing her. IT1 Remy testified she pushed Appellant and told him to "chill out" and "calm down."[4] Instead, Appellant pulled her hair, kept trying to kiss her, and grabbed her neck with his left hand. IT1 Remy testified she told Appellant to stop and that he was hurting her. While she did not scream for him to stop, IT1 Remy testified it was loud enough for him to hear her. She testified she did not want her children to hear and be scared. She tried to reach for the door, but was unable to get to it as Appellant continued to pull her back.

IT1 Remy testified she could feel Appellant's erect penis between her legs and on her buttocks, and believed he was trying to have sex with her.[5] Because of how his underwear was cut earlier in the day, when Appellant moved in a certain way, IT1 Remy would see his penis "fall out of the underwear."[6] She testified that she did not consent to his actions. She remembered "him choking

---

[2] All names in this opinion, other than those of Appellant, the judges, and counsel, are pseudonyms.

[3] R. at 524.

[4] R. at 432.

[5] R. at 436, 437.

[6] R. at 437.

[her], hitting [her hip] on [the] sink counter. [She] remember[ed] seeing [herself] in the mirror."[7] IT1 Remy did not know what caused her to lose consciousness at this point. She believed it could have been the alcohol or it could have been Appellant's actions. The next thing she remembered was waking up naked on the floor of the bathroom.[8] IT1 Remy did not know what occurred between seeing herself in the mirror and waking up on the floor.[9]

According to IT1 Remy's testimony, Appellant handed her a towel, which she wrapped around herself. She then went to find IT1 Bravo. IT1 Remy and several other witnesses testified she was upset and crying when she left the bathroom. IT1 Remy was so upset that one of IT1 Bravo's roommates put her in the shower to calm her down.

IT1 Bravo testified she saw IT1 Remy go to the bathroom and a visibly intoxicated Appellant followed her. She went in about "eight minutes" later to make sure they were not having sex in her bedroom or her bathroom.[10] She testified she heard what sounded like a sexual moan coming from the bathroom.[11] She then left and went outside. IT1 Bravo testified that twenty minutes later, IT1 Remy was calling to her from the bedroom, crying and hysterical. IT1 Remy told her, "I didn't want to do it" and asked IT1 Bravo to "kick him out."[12]

Aviation Survival Equipmentman Second Class (PR2) Yvonne, another resident of the house, was sober throughout the party. She testified that while she came outside a few times, she mostly stayed in her room. She came out at one point to use the bathroom and found it locked. IT1 Bravo told her that IT1 Remy and Appellant were in the bathroom having sex. She stayed outside a bit longer and then went back in and stood outside the bathroom. She stood there for about five minutes and did not hear anything. PR2 Yvonne went outside again, and when she came back in, someone told her IT1 Remy was looking for IT1 Bravo. She briefly saw IT1 Remy, wrapped in a towel, crying and upset in IT1 Bravo's room. PR2 Yvonne went to the bathroom and saw Appellant sitting naked on the floor with his arms around his knees. She told him to grab his

---

[7] R. at 439.

[8] R. at 440.

[9] R. at 440.

[10] R. at 548.

[11] R. at 550.

[12] R. at 442.

belongings and she would take him home. Appellant looked confused and drunk to her. She clarified further that he was almost falling asleep on the floor.

PR2 Yvonne testified that she and IT1 Bravo drove Appellant home. While in the car, Appellant said he did not understand why people were upset with him and wanted him to leave. He also admitted to having sex with IT1 Remy. Appellant was able to help PR2 Yvonne navigate to his home as needed, and both PR2 Yvonne and IT1 Bravo watched Appellant walk unassisted to his apartment.[13]

When she returned to her house, IT1 Bravo went into the bathroom and found IT1 Remy's swimsuit and Appellant's underwear on the ground, the toilet brush holder was knocked down, blood on the floor, and hair on the counter that looked like it belonged it IT1 Remy.[14] PR2 Yvonne put both the swimsuit and the underwear on top of the dryer in case they were later needed for evidence, and left the hair on the counter and did not touch it.

Mr. Walter, another roommate, also testified. He testified he had about two to three shots of liquor during the party. While he was in his room programming a video game, he heard a female voice moaning, muffled voices, i.e. he could not make out any words, and some bumping sounds in the bathroom. About ten minutes after he heard the voices in the bathroom, he heard people gathering outside the bathroom door. Those people were laughing, making fun of the people in the bathroom and trying to talk to them through the door. It was then silent for about ten minutes. He realized the people in the bathroom were still in there and he found that "peculiar."[15] He never saw who was in the bathroom. He went into the bathroom much later and saw the swimsuits and underwear on the bathroom floor, but did not notice anything else out of place.

IT1 Remy took pictures of bruises that appeared on her body after the assault, to include bruises on her neck. She had a sexual assault forensic exam done a few days later, where further photographs were taken. Both IT1 Remy and Appellant provided a statement to special agents from the Naval Criminal Investigative Service (NCIS).

---

[13] R. at 533, 638.

[14] R. at 534–535.

[15] R. at 828.

In his statement to NCIS, which was entered into evidence as Prosecution Exhibit 9, Appellant stated he did not remember what occurred after being in the pool and he did not remember any events in the bathroom. He claimed his memory picked up when he was being driven back home by PR2 Yvonne. He told the special agents that if IT1 Remy said he did things to her in the bathroom, then he believed her, even though he did not think he would do those things. During his interview, Appellant also stated he likes to practice bondage, discipline, sadism, and masochism (BDSM), which includes choking his sexual partners, as part of a consensual sexual act. He spoke about how he researched the act of choking, and how putting his hands on his partner's throat is a "baseline" for him to determine if they are "into it or not."[16] He also talked about how he is usually the dominant one in the "dom-sub" relationship.[17]

## II. DISCUSSION

**A. The Military Judge did not abuse her discretion when she admitted evidence of Appellant's previous consensual sexual acts under Mil. R. Evid. 404(b).**

The Government provided notice pursuant to Mil. R. Evid. 404(b) of its intent to use Appellant's statement regarding BDSM and choking his sexual partners to prove his motive, intent, and absence of mistake. Over Appellant's objection, the military judge allowed the Government to introduce this portion of Appellant's statement. Appellant now argues that the military judge abused her discretion.

*1. Law*

We review the military judge's decision to admit evidence pursuant to Mil. R. Evid. 404(b) for an abuse of discretion.[18] Military judges abuse their discretion (1) if the findings of fact upon which they predicate their ruling are not supported by the evidence of record; (2) if they use incorrect legal principles; or (3) if their application of the correct legal principles to the facts is clearly unreasonable.[19] "[T]he abuse of discretion standard of review recognizes that a

---

[16] Pros. Ex. 9 at 1:16:48.

[17] Pros. Ex 9 at 1:21:27.

[18] *United States v. Wilson*, 84 M.J. 383, 390–91 (C.A.A.F. 2024) (citation omitted).

[19] *Id.*

judge has a wide range of choices and will not be reversed so long as the decision remains within that range."[20] Under an abuse of discretion standard, "[w]e will not overturn a military judge's evidentiary decision unless that decision was 'arbitrary, fanciful, clearly unreasonable,' or 'clearly erroneous.'"[21]

Evidence of a crime, wrong, or other act may not be used to show character or propensity, but it "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."[22] To determine whether evidence of uncharged acts of misconduct is admissible under Mil. R. Evid. 404(b), we look to "whether that evidence is offered for some purpose other than to demonstrate the accused's predisposition to crime. . . ."[23] We will review the military judge's decision to admit the evidence at issue using the three factors set forth in *United States v. Reynolds*: (1) whether the evidence reasonably supports a finding that appellant committed prior crimes, wrongs, or acts; (2) whether a fact of consequence is made more or less probable by the existence of this evidence, and (3) whether the probative value is substantially outweighed by the danger of unfair prejudice.[24] We find each of the factors was met in this case.

*2. Analysis*

"The standard required to meet this first prong [of *Reynolds*] is low."[25] Appellant told the special agents about his interest in and his research about BDSM and choking sexual partners in consensual sexual encounters with his partners. Therefore, the evidence in the record reasonably supports the military judge's conclusion that Appellant had an interest in choking and practicing BSDM acts with sexual partners.

The second prong of *Reynolds* speaks to the probative value and the relevance of this evidence. We look to *United States v. Johnson*, where the Court of Appeals for the Armed Forces (CAAF) found the military judge did not abuse his discretion when he determined evidence of similar acts committed by the

---

[20] *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010).

[21] *United States v. McDonald*, 59 M.J. 426, 430 (C.A.A.F. 2004) (citing *United State v Miller*, 46 M.J. 63, 65 (C.A.A.F. 1997)).

[22] *United States Hyppolite*, 79 M.J. 161, 165 (C.A.A.F. 2019).

[23] *United States v. Thompson*, 63 M.J. 228 (C.A.A.F. 2006).

[24] 29 M.J. 105, 109 (C.M.A. 1989).

[25] *Wilson*, 84 M.J. at 292 (citing *Thompson*, 63 M.J. at 230).

appellant on his older daughter years before the charged offenses tended to make the "alleged abuse more probable that if the evidence had not been introduced."[26] Here, the military judge found that the similarities between Appellant's BDSM practices and the alleged offense made more probable a finding of intent, knowledge, and motive for the mens rea required for the attempted offense and the overt acts. Appellant argues that he only spoke of these activities in consensual sexual activities, while the Government wished to use this evidence to show intent to "strangle" IT1 Remy, therefore it is not probative.[27] We disagree with that assertion. He was not charged with strangling IT1 Remy, but rather "grabbing her neck."[28] Appellant's statement regarding BDSM and choking is probative of the elements of the offense as charged.

Finally, the last *Reynolds* prong is a balancing test in accordance with Mil. R. Evid. 403. In this case, the military judge found the probative value was not substantially outweighed by unfair prejudice. She stated this evidence could actually benefit the Defense, in that "[t]his is not a situation where you have two individuals that are fighting in a domestic violence relationship, and then they're – one person was choking the other out of anger."[29] This was an inartful way of stating that the prejudice was mitigated by the evidence's potential to support a claim of consent, and therefore, did not substantially outweigh the probative nature.

"When judicial action is taken in a discretionary manner, such action cannot be set aside by a reviewing court unless it has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon weighing of the relevant factors."[30] Applying the *Reynolds* factors and believing that the military judge applied the correct principles to the facts in a way that is not clearly unreasonable,[31] we hold that the military judge did not abuse her discretion when she found the Appellant's statements to NCIS agents regarding his interest in BDSM and prior use of choking in sexual encounters were relevant, probative, and were not substantially outweighed by unfair prejudice.

---

[26] 49 M.J. 467, 474 (C.A.A.F. 1998).

[27] Appellant's Br. at 42–44.

[28] Charge Sheet.

[29] R. at 88 (sealed).

[30] *United State v. Sanchez,* 65 M.J. 145, 148 (C.A.A.F. 2007) (internal quotes omitted).

[31] *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citing *United States v. Mackie*, 66 M.J. 198, 199 (C.A.A.F. 2008)).

Even if we found that the military judge had abused her discretion, we would find there was no prejudice to Appellant.[32] In order to determine prejudice, we look to (1) the strength of the government's case; (2) the strength of the defense case; (3) the materiality of the evidence in question; and (4) the quality of the evidence in question. [33]

The Government's case was strong. Appellant argues IT1 Remy's statements were inconsistent and contradictory; however, this ignores evidence that corroborates IT1 Remy's testimony. The pictures of bruising on IT1 Remy's neck, arms, hip, and buttocks taken shortly after the incident are consistent with the actions she testified Appellant did while in the bathroom, i.e. grabbing her neck, preventing her from leaving the bathroom, and hitting her hip on the sink.[34] While there was expert testimony to say some of the bruising could have happened during the games that were played in the pool, the expert also agreed that there was no testimony he heard or investigative report provided to him that stated IT1 Remy had any trauma to her neck during any such horseplay.[35] Also, the muffled voices and bumping that Mr. Walter heard is consistent with IT1 Remy's testimony that she asked Appellant to stop and "chill out" and Appellant pulling her back and preventing her from leaving. Further, IT1 Remy had no motive to fabricate what occurred in the bathroom. Earlier she was openly kissing and flirting with Appellant in the pool in front of numerous people and testified as such. Appellant's position that she was embarrassed that fellow party goers would think she was having sex with Appellant in the bathroom is incongruous.

The Government used circumstantial evidence to show that Appellant was able to form the specific intent to commit the offense of rape as required per the offense of attempt. The testimony of IT1 Bravo and PR2 Yvonne stated the Appellant appeared intoxicated. However, he was able to get dressed, walk to the car, give directions and walk uphill to his apartment. Appellant was also able to have a conversation with IT1 Bravo and PR2 Yvonne, where he said that he had sex with IT1 Remy. Further, the testimony of Dr. Bennett, a forensic psychologist, provided information regarding decision making ability while intoxicated and potentially in a blackout state. Dr. Bennett testified that "goal

---

[32] *See* Article 59, UCMJ, 10 U.S.C. § 859.

[33] *United States v. Kerr*, 51 M.J. 401, 405 (C.A.A.F. 1999).

[34] Pros. Ex. 2; Pros. Ex. 4; Pros. Ex. 5.

[35] R. at 912.

directed behavior is. . . where you make a decision to try to achieve a certain goal, and then you carry out behaviors in-line with achieving that goal. So it has to do with decisional capacity, but then also execution of that decisional capacity."[36] She gave an example of someone who wanted to commit a robbery could make the decision to do so in a blackout state using their sensory perceptions, their short-term memory, and their previously stored long-term memories.[37] It may be a poor decision and perhaps something they would not do or do not remember due to being in a blackout state, but they can still carry out the behavior even though intoxicated.[38] On re-direct examination, Dr. Bennett also testified that in a blackout state a person can respond to social cues, to include ignoring the other person saying no they did not want to have sex and continuing anyway.[39]

Appellant claimed he could not remember the events that occurred in the bathroom. He told the NCIS agents in his interview that he did not think he was the type of person who would do these actions and adamantly stated he would not have choked her to unconsciousness. But Appellant also stated: "If she remembers, then it is probably true . . . I would probably believe her."[40] The evidence discussed above, coupled with IT1 Remy's testimony that she said "no" and asked him to stop, is strong evidence that Appellant committed the offense of attempted rape.[41]

Appellant's defense primarily focused on IT1 Remy's credibility and was relatively weak. He pointed to rather immaterial inconsistencies in IT1 Remy's testimony with other witnesses. For example, IT1 Remy's belief that there was a closet between the bathroom and Mr. Walter's room was contradicted by the witnesses who live in the house and testified there was only a wall. Appellant suggested another reason to find IT1 Remy to be lying about the attempted rape was because she did not believe her children were brought into the house to avoid seeing her and Appellant in the pool in contrast to IT1 Bravo's testimony. Appellant also stated IT1 Remy's decision not to participate in portions of the sexual assault forensic examination which occurred three days after the Fourth of July should negatively affect her credibility. Lastly, in support of his

---

[36] R. at 804.

[37] R. at 805.

[38] R. at 806.

[39] R. at 810.

[40] Pros. Ex. 9 at 58:04–58:16.

[41] R. at 431–35.

position that IT1 Remy was not credible, Appellant postulated that 10 years prior when IT1 Remy was a seaman, she lied about where she was on leave and had gone to non-judicial punishment for those false official statements; therefore, she should not be believed about the attempted rape. None of these inconsistencies or facts taken separately or together render IT1 Remy's testimony not credible, particularly when compared to the evidence that corroborates her testimony.

Appellant further posited that expert testimony negated IT1 Remy's credibility and raised reasonable doubt, but this was another weak argument. Appellant focused on the testimony Lieutenant (LT) Mike, the Sexual Assault Medical Forensic Examiner (SAMFE). Lieutenant Mike stated that there were no injuries in the sexual assault forensic exam consistent with strangulation. But the Government did not charge strangulation, and IT1 Remy did not testify that she had been strangled. She testified that she did not know whether it was the alcohol she had consumed or the squeezing on her neck that caused her to become unconscious. While LT Mike said the bruises on her body could have been the result of horseplay in the pool, he did not hear any testimony nor read any report that indicated how IT1 Remy received the bruising on her neck.

Appellant's defense of voluntary intoxication negating specific intent was also weak. While he was clearly intoxicated, he was also Appellant able to walk without assistance, communicate, and provide directions to his house shortly after the incident. Appellant's statement regarding choking and BDSM, while probative, was not a particularly important factor to Appellant's conviction. Therefore, even if we found the military judge had abused her discretion in admitting that statement, we would find no prejudice to Appellant.

## B. Legal and Factual Sufficiency

### 1. Appellant's Conviction is Legally Sufficient

We review questions of legal sufficiency de novo.[42] "The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[43] In reviewing legal sufficiency, this Court "draw[s] every reasonable inference from the evidence of record in favor

---

[42] *United States v. Robinson*, 77 M.J. 294, 297 (C.A.A.F. 2018).

[43] *Id.* at 297–98 (internal quotation marks omitted) (citation omitted).

of the prosecution."[44] "As such, '[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction.'"[45] In *United States v. King,* the CAAF found "[i]n determining whether *any* rational trier of fact could have determined that the evidence at trial established guilt beyond a reasonable doubt, we are mindful that the term 'reasonable doubt' does not mean that the evidence must be free from any conflict or that the trier of fact may not draw reasonable inferences from the evidence presented."[46] "[T]he factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution."[47] Moreover, the CAAF has long recognized that the government is free to meet its burden of proof with circumstantial evidence.[48]

In order to establish Appellant's guilt to the offense of attempted rape, the Government had to prove each of the following elements:

> (i)  That the accused did a certain overt act, that is grabbing IT1 Remy by the hair and throat preventing her from leaving the bathroom and placing his erect penis against her buttocks;
> (ii)  That the act was done with specific intent to commit a certain offense under the UCMJ;
> (iii)  That the act amounted to more than mere preparation; and
> (iv)  That the act apparently tended to effect the commission of the intended offense, except for IT1 Remy losing consciousness and falling to the floor which prevented the completion of that offense.[49]

---

[44] *Id.* at 298. (alteration in original) (internal quotation marks omitted) (citation omitted).

[45] *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (quoting *United States v. Navrestad*, 66 M.J. 262, 269 (C.A.A.F. 2008) (Effron, C.J., joined by Stucky, J., dissenting)).

[46] *Id.*

[47] *United States v. Vela*, 71 M.J. 283, 286 (C.A.A.F. 2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in original).

[48] *King,* 78 M.J. at 221. This familiar standard gives full play to the responsibility of the trier of fact . . . to draw reasonable inferences from basic facts to ultimate facts. *Vela*, 71 M.J. at 286 (citation omitted).

[49] The Government had to prove not only the elements of attempt, but also that Appellant intended every element of rape by unlawful force, Article 120(a)(1), UCMJ, 10 U.S.C. § 920(a)(1).

As Appellant argued that he was too intoxicated to form the specific intent to commit the offense of rape, we also considered Rule for Courts-Martial 916(l)(2). In *United States v. Peterson,* the CAAF said:

> Voluntary intoxication may, but does not necessarily, negate the specific intent required for some offenses. It "is not a defense to a general-intent crime, but it may raise a reasonable doubt about actual knowledge, specific intent, willfulness, or premeditation when they are elements of a charged offense." When raising an issue of voluntary intoxication as a defense to a specific-intent offense, "there must be some evidence that the intoxication was of a severity to have had the effect of rendering the appellant incapable of forming the necessary intent," not just evidence of mere intoxication.[50]

We review the evidence in the light most favorable to the Government. Using this standard, we disagree with Appellant's position as to IT1 Remy's lack of credibility. While much of the evidence for the offense comes directly from IT1 Remy, there was testimony from other witnesses and photographic evidence that corroborated her recollection of what occurred at the time of the offenses as noted above. Appellant argues that his voluntary intoxication negated the specific intent to rape or sexually assault IT1 Remy. While we concur that Appellant appeared intoxicated, the testimony from IT1 Bravo, PR2 Yvonne, and Dr. Bennett provided sufficient evidence that he was not so intoxicated as to be unable to form the mens rea required for the offense. Appellant does suggest that IT1 Remy consented, or he mistakenly believe she consented to his actions based on her flirtations and kissing in the pool and the sexual moans heard by IT1 Bravo and Mr. Walter. We find this argument has no merit as IT1 Remy testified she said no and asked him to stop when he began kissing her in the bathroom, and she tried to leave, but Appellant prevented her from doing so.

Using the test for legal sufficiency as set forth above, we find Appellant's convictions to be legally sufficient.

---

[50] 47 M.J. 231, 233–34 (C.A.A.F. 1997) (internal citations omitted).

*2. Appellant's conviction is factually sufficient*

We also review this case for factual sufficiency as stated in Art. 66(d)(1)(B) and interpreted by our higher court in *United States v. Harvey*.[51]

We examined all the evidence giving appropriate deference to the trier of fact who listened to the testimony and saw the demeanor of the various witnesses, as well as weighed the other evidence introduced. We looked particularly at the testimonies of IT1 Remy, IT1 Bravo, PR2 Yvonne, and Mr. Walter, giving deference to the trier of fact as the members were able to judge demeanor and body language. In addition, we weighed the photographic evidence of bruising on IT1 Remy's neck, arms, hip and buttocks and the testimony of all the experts in determining whether or not the standard of beyond a reasonable doubt had been met. We are clearly convinced that the evidence proves Appellant guilty beyond a reasonable doubt.

### III. CONCLUSION

After careful consideration of the record and briefs of appellate counsel, we have determined that the findings and sentence are correct in law and fact and that no error materially prejudicial to Appellant's substantial rights occurred.[52]

The findings and sentence are **AFFIRMED**.

FOR THE COURT:

MARK K. JAMISON
Clerk of Court

---

[51] 85 M.J. 127, 130–32 (C.A.A.F. 2024).

[52] Articles 59 & 66, UCMJ, 10 U.S.C. §§ 859, 866.